### CULWELL v. UNITED STATES.

No. 13606.

United States Court of Appeals
Fifth Circuit.

March 6, 1952.

Before BORAH, RUSSELL, and RIVES, Circuit Judges.

BORAH, Circuit Judge.

William A. Culwell was charged in a two count indictment with having suborned the witnesses Ruby Booth and Buck Britt to testify falsely in a criminal trial before the United States District Court for the Northern District of Texas at Dallas, Texas. Having been tried before a jury and found guilty under each of the two counts against him, Culwell has appealed.

The case arose in this way: In September, 1950, the Grand Jury for the District aforementioned returned an indictment in three counts against Hanley R. Booth and Alfred Wayne Lykes. Count one charged in substance that Alfred Lykes and Hanley Booth had induced Ruby Booth and Mary Davis to go from Texas to New Mexico for the purpose of prostitution. Count two charged Alfred Lykes with having procured transportation to be used by Ruby Booth and Mary Davis in going from Texas to New Mexico for the purpose of prostitution and count three charged Lykes with having transported Mary Davis from New Mexico to Texas for the purpose of having illicit relations with her. Appellant was retained as counsel to represent Hanley Booth and Ruby Booth, the latter having reason to believe that a charge would be filed against her as a result of the trip to New Mexico. Thereafter, appellant engaged the services of Clyde Hood to assist him in the defense of Booth and prior to the trial Hood filed a motion to dismiss count one of the indictment wherein Booth was charged jointly with Lykes. The court sustained this motion and the case against Lykes under counts two and three came on for trial.[1]

At the trial Ruby Booth and Buck Britt were called to testify as witnesses for the prosecution and, in so far as here material, swore that they had not spent the night together in New Mexico. As a result of this surprise testimony and that of Mary Catherine Davis, which was contrary to the written statements that they had each theretofore given to an agent of the Fed-

James H. Martin, Joe H. Jones, Dallas, Tex., E. T. Miller, Amarillo, Tex., Howard Dailey, Dallas, Tex., for appellant.

Lester L. May, Asst. U. S. Atty., Frank B. Potter, U. S. Atty., Dallas, Tex., for appellee.

1. Appellant was not employed in the Lykes case.

eral Bureau of Investigation, a mistrial was declared and the witnesses were immediately arrested and charged with having committed perjury. However, they were not indicted for perjury but the Grand Jury returned a true bill charging William Culwell with the crime of subornation of perjury.

When this case came on for trial Buck Britt and Ruby Booth both testified as to the falsity of their previous statements under oath at the Lykes trial and Buck Britt swore that appellant suborned them to testify falsely. On the other hand, and although she wavered somewhat in her testimony, Ruby Booth swore that appellant did not induce or procure her to swear falsely.

Appellant's most serious objection relates to the error of the trial court in receiving in evidence, over timely objection, a mass of highly prejudicial and damaging hearsay. We agree that the point is well taken.

■ The trial court, over the protest of appellant's counsel, permitted attorney Clayton Heare to testify as to what various people, not subject to cross-examination, had told him. This was obviously hearsay as to appellant who was on trial and its highly prejudicial character is apparent.[2]

■ Another instance of the admission of hearsay as evidence against the defendant is found in the testimony of the government's witness Ruby Booth. In the course of her direct examination she admitted spending the night with Buck Britt in New Mexico but denied that the appellant induced her to swear to the contrary at the Lykes trial. Whereupon, the government attorney indicated his displeasure with the gratuitous and improper observation that the witness was lying again. He then produced what was identified as a written statement previously made by the witness to a government agent in Denver, Colorado and over strenuous and repeated objections of appellant's counsel was permitted to read before the jury from the lengthy statement the numerous prejudicial statements therein contained, with a query to

2. In referring to conversations which he had with Buck Britt, Mr. Heare said: "He told us that he had—he give us the background about having met Mrs. Booth, Ruby Booth, I believe, at the Old Tascosa Room, if my memory serves me correct, in Amarillo, in the Herring Hotel, sometime before that; that they had become acquainted, and had become intimate at times; that she and another lady had come to Clayton, New Mexico, where he lived, and that they left their car there, I believe it was the other lady claimed to have owned the car, or Booth owned it, or something, left their car there, a Cadillac, as I recall it, and that Mr. Britt had taken them to Raton, New Mexico, and that they went night-clubbing, I believe he called it honkey-tonkeying, but, anyway, they went around to places of leisure at night. Then, they went back to the hotel, and that he had spent the night with Ruby Booth, and then had taken them back to Clayton the next day, and the Cadillac was gone, * * *.

"Q. Now, tell us, when Mr. Britt got to your office, he told you that he had been charged in this Court for perjury? A. He told me that he had testified falsely here in this court, and had been held for perjury.

"Q. All right, did he tell you what he had testified falsely to? A. Yes, he said

he, on the witness stand, he had either denied that he fraternized with Ruby Booth, and had denied he had given her any money.

"Q. Did he tell you what the truth was? A. Yes, sir, that is, he told me what he said was the truth.

"Q. Did he tell you why he testified falsely? A. Yes, sir.

* * * * * · * *

"Q. All right, and what did you advise him to do, Mr. Heare? A. Mr. Underwood and I told him that the only way he could do any good for himself in a mess like that was to tell the God awful truth wherever it might be asked him."

The witness was also permitted to testify as to a conversation which he had with Ruby Booth.

"Q. Now, did she tell you she had perjured herself in that trial? A. She told us she had given false testimony.

"Q. That is right, and what did you advise her to do? A. To tell the truth.

"Q. You did not tell her that if she put it off on somebody else she might get out of a perjury indictment herself, did you? A. No, sir.

"Q. You just told her to tell the truth, did you? A. I told her * * * to tell the truth, that the truth would have its own rewards."

the witness at the end of each sentence as to whether her previous statement was true or untrue.[3]

It is the established rule that impeachment of one's own witness may be resorted to where his testimony has surprised the party offering him. However, the impeaching matter is to be limited to the point of surprise and even where there is a real surprise it is not proper to permit the impeachment testimony to go beyond the only purpose for which it is admissible, i. e., the removal of the damage the surprise has caused. "In no event may the fact that a witness has made contradictory statements be used as it in effect was here, as a basis for completely discarding the rules of evidence against hearsay and ex parte statements, and, as impeachment, opening the flood gates of prejudicial and damaging hearsay." Young v. United States, 5 Cir., 97 F.2d 200, 206. Moreover, the damage claimed must not have been self-inflicted by continuing, as here, to put in damaging statements after the witness' hostility has been discovered.

In Kuhn v. United States, 9 Cir., 24 F.2d 910, the procedure followed by the district attorney was quite similar to that pursued by the government attorney in the case at bar and the court rightly condemned the procedure as improper. As we pointed out in Young v. United States, supra, " * * * it is ordinarily the best practice, if it can be effectively done, when a party shows that he has been surprised

by the adverse testimony of a witness he has offered, to permit him to withdraw the witness and his testimony from the jury by having the whole evidence stricken from the record, as was done in Kuhn v. United States, 9 Cir., 24 F.2d 910."

If, on the contrary, the court does not follow this course, it may in the exercise of its discretion permit the witness' testimony to remain in the record for such weight as it may have in the light of its impeachment provided it limits the impeaching evidence to the point of surprise and provided further that it carefully instructs the jury that the impeaching evidence is not admitted as evidence in the offeror's favor but merely to destroy the credit of the witness, to remove the damage caused by the surprise. Here, at the time that this mass of hearsay evidence was received[4] and had its impact on the jury, the court did not caution the jury that the contradictory statements could have no legal tendency to establish the truth of their subject-matter. Southern Railway v. Gray, 241 U.S. 333, 337, 36 S.Ct. 558, 60 L.Ed. 1030. Nor was this omission cured by the court's charge,[5] which fell far short of compliance with the careful instruction demanded by the authorities.

The testimony of the witness Bush was also prejudicial to Culwell. Over the objection of appellant, Bush, an agent of the Federal Bureau of Investigation, was permitted to testify in detail as to conversations which he had with Ruby Booth in Denver, Colorado on three successive days.

3. The following are typical of the questions and answers:
"Q. The majority is true. Let's see which part is true, and which part is not true? 'I had spent the night together in a hotel room in Raton, New Mexico, during the first part of June, 1950, it would be very embarrassing to both Britt and me. At that time, Culwell said this, or this in substance: "If you two were together in Raton, New Mexico, in a hotel room, overnight, it would save you a lot of publicity and scandal, if you would testify on the witness stand that you had never been together in a hotel room in Raton."' Is that true, or untrue? A. Well, Mr. Culwell did not exactly say it that way.

"Q. Well, now, if that is not true—. A. That is what Buck and I had said before, had planned together, and we had told Billy what we really wanted to do, if it would save us any embarrassment."

4. The court said, "Find out what is true, read it from period to period and find out what part is true."

5. In its charge to the jury, the court without any other explanation said: " * * * such excerpts of a statement * * * given * * * by the witness Ruby Booth was admitted in evidence * * * to aid you * * * in determining the credibility of Ruby Booth and not as direct evidence against the defendant."

These conversations were hearsay as to appellant. During his examination the witness identified a written statement which he had taken from Ruby Booth and the statement, over the protest of appellant, was offered in evidence for identification. Later, and after numerous objections had been interposed to the consideration of this document, the court permitted the government attorney to read long excerpts therefrom, in keeping with its ruling that the government was permitted to inquire as to such portions thereof as Ruby Booth had been asked about while she was on the witness stand. This evidence was objectionable as hearsay[6] and should have been excluded.

■ Considering the meagerness of the government's evidence and considering the effect that the errors had or reasonably may have had upon the jury's decision, we think the mass of inadmissible testimony must have had a substantial, prejudicial effect on the jury. In any event, we are unable to say that the errors did not influence the jury or that they had but slight effect. Kotteakos v. United States, 328 U.S. 750, 764, 66 S.Ct. 1239, 90 L.Ed. 1557.

■ Another question of sufficient dignity to merit consideration is appellant's contention that subornation of perjury must be supported by two witnesses or one witness and strong corroborating circumstances. It is true that the courts frequently say that perjury and its subornation have been defined and considered as part and parcel of the same offense. It is also true, following the rule of evidence governing perjury prosecutions, that in a trial for subornation of perjury the falsity of the testimony cannot be proved by the uncorroborated oath of one witness. Hammer v. United States, 271 U.S. 620, 46 S.Ct. 603, 70 L.Ed. 1118.

For a full discussion of the evidence required in perjury cases see McWhorter v. United States, 5 Cir., 193 F.2d 982. On the other hand, the act of soliciting another to commit perjury does not involve the theory of oath against oath and the inducing is generally held to be properly established by the uncorroborated testimony of one witness. Hammer v. United States, 2 Cir., 6 F.2d 786, 789; United States v. Silverman, 3 Cir., 106 F.2d 750. Appellant's reliance on Hammer v. United States, 271 U.S. 620, 46 S.Ct. 603, 70 L.Ed. 1118, is illfounded. In that case the court expressly refused to consider whether the testimony of one witness was sufficient to establish the fact of subornation.

We consider it unnecessary to pass upon the other questions presented as they will probably not be raised upon another trial.

Reversed.

---

6. The following is typical of the examination of Bush:

"Q. During this conversation, Billy Culwell told Britt and me that he would advise us to deny on the witness stand that we had spent the night together at the hotel in Raton, New Mexico on or about June 3, 1950.' Did she tell you that? A. Yes, sir.

"Q. Did she further tell you: 'Culwell suggested that we testify that Buck had left me at the hotel in Raton on the night of June 3rd, and had gone to his ranch, and then had returned to the hotel at Raton on the following morning'? A. Yes, sir.

"Q. Did she tell you that? A. She did.

"Q. Did she tell you this: * * *.