## YOUNG v. UNITED STATES.*
### No. 8532.

Circuit Court of Appeals, Fifth Circuit.
June 7, 1938.

*Rehearing denied 97 F.2d 1023.

HOLMES, Circuit Judge, dissenting.

———◆———

Ayres K. Ross, of Austin, Tex., for appellant.

W. R. Smith, Jr., U. S. Atty., and H. W. Moursund, Asst. U. S. Atty., both of San Antonio, Tex.

Before FOSTER, HUTCHESON, and HOLMES, Circuit Judges.

### HUTCHESON, Circuit Judge.

Brought under Secs. 253 and 452, Title 18, U.S.C.A., the charge of the indictment was that appellant did willfully and voluntarily, and with malice aforethought kill by shooting with a gun an investigator in the service of the Internal Revenue, while engaged in the performance of his official duties.

Conceding that appellant did not actually fire the gun which killed Thomason, the investigator, the general theory of the prosecution was that appellant was a principal, under the Federal statute of Principals, Sec. 550, Title 18 U.S.C.A. one who "aids, abets, counsels, commands, induces, or procures [the] commission" of an offense. As particularly applied, the theory of the prosecution was that appellant was the owner and operator of an illicit still; that assisting him as lookout man and guard was one Pete Martinez; that some time prior to the killing, and in connection with his duties as lookout and guard appellant had given Martinez the pistol with which Thomason was killed, instructing him generally to keep a lookout, to avoid notice and detection if possible, but if discovered, to shoot it out with any officers attempting their arrest, or to take the still; that at some time before the killing Martinez had told appellant that he was a good shot, and that if the officers tried to capture the still he would shoot it out with them, and the best man would win; that Young had told him he hoped that he would prove a man of his word; that on the night of February 14, 1937, Thomason and other officers captured Young and one Hazel Hamilton, while actually operating the still, and, one of the officers holding those two prisoners, Thomason left the site to make a further search; that he suddenly came upon Pete Martinez and a fifteen year old boy, Hucel Hamilton, and upon his command, "stick them up" Martinez acting under the instructions from and promises to appellant, commenced firing; that a pistol battle then ensued, in which both Martinez and Thomason were killed. There was a verdict against Young of murder in the first degree as charged, without capital punishment, and a sentence and judgment of imprisonment in the United States penitentiary for the remainder of his natural life.

By this appeal he maintains that greatly prejudicial error was committed on the trial of his case, in respect of, the admission as evidence against him of matters not receivable as such, and of, the denial of his motion for a directed verdict. The point made on the denial of the motion to direct is that the undisputed evidence showed that Young was at the still unarmed, and in the custody of the officers when the gun battle which cost Thomason his life occurred, and there was no evidence that he at any time, by word or sign, ever advised, counseled, aided, induced or procured the shooting of Thomason; that it occurred as the result of an unexpected meeting and affray between Thomason and Martinez, and that the verdict, therefore, that appellant killed Thomason with malice aforethought, is wholly without evidence to support it.

There are several assignments as to erroneous admissions into evidence. Appellant's main reliance, however, is upon the proposition that the Government was permitted, without having been surprised by the testimony of a hostile witness, to

get before the jury in form as impeaching testimony, but in fact as independent evidence, a mass of matter not admissible as evidence, and in the state of the record, fatally damaging to him.

We think little need be said upon the first point, the denial of the motion for instructed verdict, and the want of evidence to support it. The Government did indeed, by introducing a completely exculpatory statement of defendant, in which he denied having given Martinez either a gun, or any instructions whatever as to guarding the still or shooting it out with officers, thereby raise a presumption in his favor that the exculpatory statements were true, which required their falsity to be shown beyond a reasonable doubt. 18 Tex.Jur. Sec. 106, p. 194; Spicer v. State, 113 Tex. Cr.R. 616, 21 S.W.2d 737; Villareal v. State, 101 Tex.Cr.R. 251, 275 S.W. 835; Cokeley v. State, 87 Tex.Cr.R. 256, 220 S.W. 1099; Nichols v. State, 110 Tex.Cr.R. 432, 10 S.W.2d 109; Cook v. State, 71 Tex. Cr.R. 532, 160 S.W. 465. However, the other evidence, if admissible and believed, warranted a jury finding that Young armed Martinez and put him on post, with instructions to kill any officer who should attempt to seize the still or arrest those connected with it, and with the purpose and belief that he would do so. If this was so, his hand in law fired the shot which killed the officer, and he is as guilty of his willful killing as if he had been standing by while the shooting was going on, urging and directing it, or himself had held the gun. Under Federal statutes he who, in the commission of an illegal act with others, such as maintaining an illicit still, conducting a burglary or holdup, arms and instructs his confederates to kill if obstructed in the attempt, with the purpose and intent that they do so, is in law a principal in any willful killing which results from carrying out those instructions.

Upon the questions the other assignments raise the admission into evidence of statements made by and letters written by and to the witness Hamilton, in impeachment of his testimony, the matter stands, we think, quite differently. Without these admissions, the Government's case was almost, if not quite, fatally lacking in the clear and convincing proof of that high order of credibility which the nature of the charge and the state of defendant's proof, demanded. The admission into evidence of these statements and letters was fatally damaging to defendant, and if their admission was erroneous, a reversal is required. A brief summary of the evidence on the crucial point, the claimed arrangement between Martinez and the defendant for guarding the still, and shooting it out with officers will show, inescapably, we think at once the damaging character and the complete inadmissibility of this proof. Hamilton's statements aside, there is no proof in the record directly or circumstantially in any way tending to support the Government's claim, except the testimony of three persons, who were inmates of the jail in which defendant was confined, who testified to having had or heard conversations in which he made admissions as to his connection and arrangements with Martinez. Cf. Cokeley v. State, 87 Tex.Cr.R. 256, 220 S.W. 1099. One of these persons was Richard Palmer, an habitual offender, then serving a life sentence for murder, who testified in substance that in one conversation the defendant had told him; that he had a fellow named Pete Martinez working for him; that when the officers came and arrested him, and one stayed with him, and the other went off, he knew at the time the officer left that his life was in danger if he went in that direction; that the Mexican was waiting down there with a gun he had furnished him, or knew something about, and that the Mexican was a good shot; he said he could distinguish the shots, one of them was his gun, and he said he knew at the time the shooting occurred that the man's life was in danger, because the Mexican shot first. He further testified that in a subsequent conversation the defendant told him the Mexican was working for him at the still, and was supposed to carry water and watch the trail that led to the still. "He told me for what purpose the Mexican was supposed to watch it. He said if anybody came up to the still or near the Mexican who was watching, he was supposed to lookout, and if anybody, did not necessarily mean officers, came onto his trail he was supposed to shoot once, as a warning shot, to give them an opportunity to go away, and then if the party did not leave, to shoot, and shoot to kill." At another time the defendant told him that if it had been some other officer, except the one that it was, he would have given him warning, and told him not to go there where the Mexican was. "He said he did not mind seeing this particular officer walking that way into a death trap."

Another one was Kohutek, confined in the jail for a misdemeanor. He testified that as trusty he had the privilege of going all around the jail, and he got acquainted with Richard Palmer while in jail; that while in the runaround outside the cells he heard conversations between the defendant and Palmer, with regard to the killing of a Federal Officer and the operation of a still; that the defendant stated that he heard the shooting and the rapid firing, and he said he knew it must have been the Mexican shooting because he knew that gun would never miss; that he heard that gun first. "He said he knew that gun would never miss and that he put the Mexican down there for a guard, for a lookout man. He said that when he put the Mexican down there he was safe, that nobody would ever get up to the still"; that he heard a conversation about killing a Federal officer and that appellant made the remark "the Goddamn son of a bitch was dead, and would never bother nobody else"; that he also said he was expecting a raid on the still by Federal officers. On cross examination Kohutek said the conversation between Palmer and Young all happened at one time, the night he was standing there.

The third was B. L. Vann, in jail 45 days for drunkenness. He testified that while in jail he heard the defendant make statements with reference to operating a still and the killing of a Federal officer. "The defendant said he had a Mexican working for him; the Mexican was operating the still or fixing to operate it; that he heard two shots and recognized his gun when it was fired; that it was his but he had sold it to the Mexican and that the Mexican was on guard working for him."

Other testimony of the Government was indeed sufficient to connect Martinez with defendant and the still, and defendant in some way with the gun Martinez had, but this was all that it did. But aside from Hamilton nobody testified to knowing of or overhearing any arrangement between Martinez and defendant for guarding the still or shooting it out with officers.

In addition to this lack of positive testimony in support of the Government's theory of guilt, and the character of the witnesses who had testified to defendant's admissions, the Government further weakened its case by offering as a confession of defendant's, his exculpatory statements; that though Martinez came around the still

often, and drank some whiskey, and had been there about thirty minutes before the officers came up; that though the gun Martinez shot with had been defendant's he had some time before traded it to Martinez; and that Martinez was not working for him, and that he had never given any instructions to Martinez as to guarding the still or shooting it out with officers.

The Government's case standing thus, it was highly important to it to get before the jury, in some way, the favorable statements it had secured from Hucel Hamilton while he was in jail under charges growing out of the still and the shooting. It therefore, though it knew from letters in its possession that Hamilton would repudiate those statements when before the Judge, put him on the stand with the intention, apparently, of getting his statements into evidence by impeaching him. Placed upon the stand, he testified that he was sixteen years old; that he lived with his mother and sisters in defendant's house; that he had known Pete Martinez; that he had seen him several times; that he had gone up to the still the day of the shooting; that he had not seen Martinez that afternoon until he saw him at the spring, about 5:30 in the afternoon, when he, Hamilton, came to the spring to get water; that a Federal officer came and said "stick them up" and they started to shoot at one another; that he said nothing to Pete and Pete just turned around and went to shooting; that he could not tell which shot first; that after the shooting he picked up the gun and ran home, and gave the gun to his sister Beulah.

Thereupon the District Attorney asked the witness:

"Now, were you questioned that night after the shooting early the following morning?

"A. Yes sir.

"Q. And didn't you give this statement which Mr. Holt took on the typewriter?

"A. Yes sir.

"Q. I will ask you if you made this statement—'On Sunday, February 14, 1937, about 8 o'clock in the morning, my sister Hazel, and my brother Howard and myself went across the river to milk some cows and then went back to the house and then Pete Martinez, Ike Young and myself went back across the river to go to the still—'"

The appellant objected and stated that he objected to any statement he might have made. Whereupon the following occurred:

"The District Attorney: I will offer the whole thing, and my answer to that is there are some very material things this boy has testified to here, things diametrically different from the statement he has sworn to.

"The Court: If you are surprised by his evidence you are entitled to impeach him on that part of the evidence.

"The District Attorney: That is what I propose to do—I have already asked him the questions and he has given different answers to what is contained in his statement.

"The Court: All right, I will let you offer the statement for impeachment purposes only—"

to which an exception was taken. Thereafter, the District Attorney, by questions and by reading from the statements, got before the jury statements not only that Martinez, Hamilton and Young were working at the still, and that he thought Pete fired the first shot, but this, which was greatly damaging to defendant, if believed:

"Before we left the house to go to work on the still in the morning and on the day the shooting took place, Ike gave Pete a gun and scabbard, and Pete put the gun and scabbard on his belt on the righthand side, and when we got to the still Ike told Pete to protect himself at the still and shoot if you have to, and Pete said he would. Pete told Ike that he would not let anybody come up to the still after Ike told him not to let anybody come up to the still. After Ike told him that, Pete said if anybody come up there and they didn't look right, the best man would win, and Ike said 'I hope you are a man of your word.'"

In addition to this statement, another statement was offered, purporting to have been made by Hamilton the next morning after the shooting, in which the witness stated—

"There at the house yesterday morning Ike said, Well Pete you can wear the gun this time, and gave Pete his 38 Colts:

"Q. Did you ever see this gun during the day?

"A. I saw it on Pete who wore it the rest of the day.

"Q. During this time that you all were sitting around the still talking, did you see this gun Pete was wearing?

"A. Yes sir; Pete had it on and I could see him.

"Q. Did you hear any conversation between Ike Young and Pete during this time?

"A. Ike told Pete he could shoot it out with them, or run if he wanted to.

"Q. When Ike told Pete that he could shoot it out with them, if he wanted to, what did Pete say?

"A. Pete said, well, the first man that comes up here and draws a gun, the best man will win, and Ike said, 'I hope you are a man of your word.'"

The witness was also asked whether before the grand jury he had not testified substantially to what he had said in his statements as to what Ike told Pete, and Pete told Ike at the still that afternoon.

All of this was offered over the objections of defendant, and in addition, while Hamilton was on the stand, the Government offered two notes, one written by Hamilton's sister to him, and one by him in reply, while they were both in jail. When these were offered they were objected to by defendant and the following colloquy occurred:

"The Court: You offer these letters in evidence for the purpose of impeachment of this witness?

"The District Attorney: Yes sir to shed what light they may as to which of four different statements made by the witness are true.

"The Court: I overrule the objection and will let the evidence in for impeachment only."

Whereupon the District Attorney stated —"I will state to the Court that these letters are hard to read, and I have carefully gone over them before I came into court several days ago, and I have written it out in my own handwriting."

"From Beulah to Bud:

"Be shure you tare this up don't let noBody see you read this. Listen Bud in know all about what you done on your trip. Listen and if you don't do what I told you to I am going to tell them what you done when you brought that gun across the river. But if you don't change what you said about Ike giving that gun to Pete they will hang him and me and you Both.

Bud how can you do him like that as good to you as he has Ben. Bud I want you to rite and tell me what you are going to do so I will no Bud ant you going to change what you have said and soon

"From Bud to Beulah:

"I am going to tell the judge I lyed about the gun and what I told them Ike told Pete But they know how the shooting happened because there was another law up on the hill from the spring and saw it and they aint no use on trying to tell them Pete run first they even found where the laws Bullets cut the grass but am going to tell I lyed about Ike telling Pete to kill anybody that come up there. I am going to tell that to the judge The end from Bud."

On cross examination the witness testified that he did not read the statements before he signed them; that he was in jail when he made them and made them because he thought he would get out; that some parts of the statement were true and some was a lie, and what he had testified that day was the truth; that Pete did not have anything to do with the still and that he never knew him to be so connected.

■ The rule in its original and strict form against impeaching one's own witness is discredited everywhere, and it is generally recognized that impeachment may be resorted to where a witness has surprised the party offering him, by his testimony. The overwhelming weight of authority however, supports the rule that though trial courts should, in the exercise of a sound discretion to prevent injury from the surprise testimony of a hostile or corrupt witness, permit cross examination and impeachment by contradictory statements, it is never permitted to make of the rule an artifice by which inadmissible matter may be gotten to a jury through the device of offering a witness, whose testimony is known to be adverse, in order, under the name of impeachment, to get before the jury for its weighing, favorable ex parte statements the witness has made. To the relaxation of the rule against impeaching one's own witness by introducing his ex parte statement in contradiction of his testimony, it is fundamental, we think, that the party offering the witness be really surprised at his testimony. Further, it is equally fundamental that the impeaching testimony be admitted not for the purpose of supplying what the witness was expected to, but did not, say, as a basis

for a verdict, but only to eliminate from the jury's minds any positive adverse effect which might have been created by the testimony which has surprised the offerer.

■ Because this is so, it is ordinarily the best practice, if it can be effectively done, when a party shows that he has been surprised by the adverse testimony of a witness he has offered, to permit him to withdraw the witness and his testimony from the jury by having the whole evidence stricken from the record, as was done in Kuhn v. U. S., 9 Cir., 24 F.2d 910. By this course, if the claim of surprise is made, as indeed it should be, only for the legitimate purpose of removing the prejudice of the surprising testimony, and not for the purpose of getting the contradictory statements before the jury for their effect upon it, the purpose of protecting the party, who offered him, from injury at the hands of the witness is accomplished without complicating the issues or confusing the jury.

■ But this is not the only course which may be pursued. "On a showing to the court that it ought not to be bound by what [the witnesses it offered] had testified, because it had been entrapped by them," New York Life Ins. Co. v. Bacalis, 5 Cir., 94 F.2d 200, 202, the court may, in the exercise of its discretion, limiting the impeaching matter to the point of the surprise, permit the evidence to remain in the record for such weight as it may have in the light of its impeachment, and of a careful instruction by the court, that the impeaching evidence is not at all admitted as evidence in the offerer's favor, but for what effect it may have in overcoming the testimony which has surprised the offerer. In short, the impeaching and contradictory statements are "admitted only to destroy the credit of the witnesses, to annul and not to substitute their testimony." Id.

It is, in our opinion, never admissible under any sound interpretation of the rule, certainly not in Texas, nor in the Fifth Circuit, to offer a witness whose testimony the offerer knows in advance will be adverse, in order to get before the jury, in the form of impeachment, contradictory statements of his which are useful to the prosecutor. Royal Insurance Co. v. Eastham, 5 Cir. 71 F.2d 385, 388; Odneal v. State, 117 Tex.Cr.R. 412, 36 S.W.2d 1020; Barham v. State, 130 Tex.Cr.R. 233, 93 S.W.2d 741; c/f Blochowitz v. Blochowitz,

122 Neb. 385, 240 N.W. 586, 82 A.L.R. 955; Kuhn v. U. S., supra.

■ Neither, even where there is a real surprise, is it proper to permit the impeaching testimony to go beyond the only purpose for which it is admissible, the removal of the damage. the surprise has caused. In no event may the fact that a witness has made contradictory statements be used as it in effect was here, as a basis for completely discarding the rules of evidence against hearsay and ex parte statements, and, as impeachment, opening the flood gates of prejudicial and damaging hearsay. Dewey Ward v. United States, 5 Cir., .96 F.2d 189.

From the beginning the courts of Texas have so held. White v. State, 10 Tex. App. 381; Odneal v. State, supra; Gulf, C. & S. F. R. Co. v. Harrell, Tex.Civ.App., 270 S.W. 187; Morgan v. Stringer, 120 Tex. 220, 36 S.W.2d 468; Latham v. Jordan, Tex.Com.App., 17 S.W.2d 805; Barham v. State, supra. This has been the uniform rule in the Fifth Circuit. Sneed v. United States, 298 F. 911; Georgia Casualty Co. v. Waldman, 53 F.2d 24; Royal Ins. Co. v. Eastham, supra; New York Life Ins. Co. v. Bacalis, supra; Dewey Ward v. U. S., supra. Most United States Circuit Courts of Appeals, most state courts, are in agreement. A note to Sec. 905, concluding an interesting discussion, Sec. 896-905 incl., Vol. 2, 2nd Edition Wigmore on Evidence, and a note to the same section, in the 1934 Supplement second edition, sets out with, it seems to the writer, a little bias in favor of the author's general condemnation of the rule, pretty fairly the state of the authorities. While Texas Law of Evidence,[1] and a note in XV Texas Law Review No. 1, pp. 132, 133, show that the Texas courts strictly apply the rule to prevent its being used as a device for getting favorable ex parte statements before the jury.

■ All of these cases make it clear that to admit such contradictions, there must be not only surprise, but damage, and the damage claimed must not have been self inflicted by continuing to put in damaging testimony after the witness's hostility or change of front has been discovered in order to open the gate to let his favorable

ex parte statements in. Royal Ins. Co. v. Eastham, supra.

A recent and well considered case from the Second Circuit, is United States v. Block, 88 F.2d 618. The only, Federal case which has been called to our attention, in which surprise has been held not a factor, is a civil case, London Guarantee & Accident Co. v. Woelfle, 8 Cir., 83 F.2d 325, 335. Being a civil case, the court may have been though it did not say so, following a prevailing state rule.[2]

Be that as it may, this decision is not in accord with the generally prevailing view, as reference to any text book will show. It is certainly not in accord with the rule prevailing in Texas, and in this Circuit.

■ The charge on which appellant was tried was an unusual one, first degree murder, by a killing induced and procured by general instructions in advance. Legally sufficient though it is, it is of a kind which ought to be substantiated by clear and convincing proof of a high order of credibility. Such proof was woefully lacking in this case. The testimony of three convicted persons, one a convicted murderer, to admissions made by appellant while confined with them in jail, and without the warning and written form which the Texas Code of Criminal Procedure requires, was all the evidence the Government had to sustain its case, until, by putting Hucel Hamilton on, it opened the sluice gates of inadmissible and damaging hearsay, to let in the admissions of Hamilton obtained from him while a prisoner in the jail, and while under the greatest compulsion to exculpate himself by inculpating the defendant, in support of the theory upon which the Government had pitched its case. Having offered Hamilton with the full knowledge, from the notes exchanged between him and his sister, which the District Attorney had had in his possession for days, that before the Judge he would repudiate these statements, surprise was of course, not claimed. But on the theory that he had a right to impeach him because he had made prior contradictory statements, the District Attorney put into the evidence the two prior statements he had made, and his testimony before the grand jury, under offers and instructions

---

[1] McCormick and Ray.

[2] See discussion of that question in Royal Ins. Co. v. Eastham, supra, and XIII Texas Law Review, Vol. 1, pp. 19-

28, in which the rulemaking power of the Supreme Court is discussed, and Note, XV Texas Law Review, p. 265.

so worded as that the jury was certain to believe that the whole of Hamilton's testimony, including the statements he was interrogated about, was before them to determine from them all, which of his statements was true.

But this is not all. The two notes, written by Beulah and Hucel Hamilton respectively were also admitted, in the words of the Government, "to shed what light they may on which of the four statements, made by the witness are true", and while the court stated that they were offered for impeachment only, this was all that was said, and the jury was allowed to take the whole matter without explanation or instructions as to what was meant by "for impeachment purposes only." Particularly were they left uninformed that the evidence was admitted only to remove any prejudice Hamilton's testimony might have caused the State, and not in order that if they believed his ex parte statements, they might receive them as evidence to supply the place of the favorable testimony he would have given if he had testified in accordance with their tenor and purport. Kuhn v. U. S., supra.

While the case must be reversed for these errors, and it is not likely that any of the other rulings on evidence which are complained of will occur on another trial, we think it proper to say that we do not think any of the objections to them are well taken. For the errors alone, therefore, of admitting the statements and letters of and to Hamilton, the judgment is reversed and the cause is remanded for further and not inconsistent proceedings.

Reversed and remanded.

HOLMES, Circuit Judge (dissenting).

The hypothesis that the prosecuting attorney was not surprised by Hucel Hamilton's testimony is not warranted by anything in the record, and the presumption is to the contrary. In spite of the letters which passed between Hucel and Beulah Hamilton, it is probable and should be presumed that the attorney talked to Hamilton before introducing him as a witness, and was told that the facts set forth in the statement were true and would be testified to by him on the witness stand. 28 U.S. C.A. § 391; Haywood v. U. S., 7 Cir., 268 F. 795, certiorari denied 256 U.S. 689, 41 S.Ct. 449, 65 L.Ed. 1172; St. John v. U. S., 7 Cir., 268 F. 808; Kuhn v. U. S., 9

Cir., 24 F.2d 910, certiorari denied 278 U.S. 605, 49 S.Ct. 11, 73 L.Ed. 533.

The court below ruled that counsel was surprised, and no contention to the contrary was even suggested on the trial by appellant's attorneys. Hamilton was an unwilling witness, and the United States Attorney had the right to cross-examine him and to ask him leading questions. The trial court has a discretion with respect to the scope of the examination of witnesses, which, in the absence of abuse, an appellate court should not undertake to control. Levy v. U. S., 8 Cir., 35 F.2d 483, citing Hickory v. U. S., 151 U.S. 303, 14 S.Ct. 334, 38 L.Ed. 170, and St. Clair v. U. S., 154 U.S. 134, 14 S.Ct. 1002, 38 L.Ed. 936.

It is indisputably established by the verdict of the jury that an officer of the Alcohol Tax Unit was murdered by Pete Martinez, an employee at an illicit distillery owned and operated by appellant. The fatal bullet came from a pistol which had been put in Pete's hands by appellant for the purpose of enabling him effectively to guard the still against interference by governmental officers. Moreover, this employer gave his employee specific instructions to "shoot it out with them." The appellant said that he saw the officer walking into a death trap; that if it had been some other officer, he might have warned him; that he put the Mexican down there for a lookout man; that he knew nobody would ever get up to the still; that he heard the gun fire and knew it was the Mexican shooting, knew it was his gun, and knew that it never missed; that he was glad the Goddamned son-of-a-bitch was dead and would not bother anybody else; and that appellant had been expecting a raid on the still by federal officers.

After a two days trial, the jury returned a verdict of murder in the first degree without capital punishment, and appellant was sentenced to imprisonment for life. This verdict should not be set aside for slight and inconsequential errors (28 U.S.C.A. § 391); but I am not of the opinion that the court erred. The effort to impeach the witness took a wide range— wider than should ordinarily be permitted —but if prejudice to appellant resulted therefrom, it was brought about by the insistence of his attorney that the whole statement and not just parts of it be admitted. It was in accordance with the

208

principle insisted upon by appellant's counsel that the United States Attorney offered the entire documents in evidence.

I respectfully dissent from the judgment of reversal.