**Truby Clarence SLADE, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 17583.**

United States Court of Appeals
Fifth Circuit.

June 23, 1959.

Zach H. Douglas, Jacksonville, Fla., for appellant.

Wilfred C. Varn, U. S. Atty., F. E. Steinmeyer, III, Asst. U. S. Atty., Tallahassee, Fla., for appellee.

Before JONES, BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The question here is whether the jury was adequately instructed on the permissible use of a prior inconsistent statement offered by the Government in impeachment of a key, but hostile, witness.

Slade and Conrad were jointly indicted, tried and convicted on a two-count indictment for illegal possession and removal and concealment of moonshine whiskey. 26 U.S.C.A. §§ 5008(b) (1), 5642, 5632. Only Slade appeals.

This was the prosecution's theme. Florida Highway Officers making a routine patrol on New Years Eve January 1, 1958, saw a bread delivery truck parked unattended on the shoulder of a highway. Examination of the truck disclosed that instead of carrying the staff of life, it was loaded with 60 five-gallon glass jugs of shine. Other officers were summoned by radio for surveillance and, in the hope soon made good, to close in for apprehension of those responsible when and as they would surely return, as they did. Within an hour or so a wrecker, owned and driven by Hardy, followed by a Dodge driven by Slade, arrived at the scene. Shortly Conrad, driving a Plymouth Fury, came from the opposite direction.

An officer from a nearby ambush saw Slade get in the front of the truck and testified that after the arrest Slade had stated that he, Slade, had tied the steering wheel of the truck so that it could be towed by the wrecker back-end-first and raised. The significance of this was to establish active participation by Slade and to charge him with knowledge of the truck's contents then so plainly visible from even a mere glance.

Conrad, so Hardy finally but reluctantly testified, instructed Hardy to follow the Fury to a farmhouse about six miles away. The caravan got underway with the Fury in the van, the wrecker and its disabled tow in the middle with Slade in his Dodge bringing up the rear. As the convoy proceeded, the vanguard got cut off from the main column by a passing railroad train at a crossing. Conrad's Fury stopped and waited on the far

side of the track, ostensibly, so he and his companions asserted, to check the skirt on one of his rear fenders. About the time the convoy reformed and got underway, the officers, hovering near at hand, threw up a roadblock, stopped the procession and took cars, wrecker, bread truck, their cargo and occupants to the jail.

The defensive theme, reflected by questions on cross examination, some statements made by Hardy to the claimed surprise of the Government, who vouched for him, and made explicit by testimony of Slade and Conrad, could not hope to overcome physical presence of either or both at the transitory scene of the crime, or their respective physical activities. It sought, rather, to paint the picture of innocent helpfulness by Slade and innocuous coincidence by Conrad.

Only Slade's story really concerns us now. According to him, he was at the B & G Truck Stop, apparently a restaurant and filling station. He was presumably awaiting his girl friend who would shortly arrive with the Conrads who would, at his request, shortly thereafter convey to his pregnant wife then at home the message that he had gone out to help tow a broken-down truck. About this time, he saw Hardy who had driven up in his wrecker. Hardy, whom Slade knew, told Slade that he had received a call to pick up a disabled truck and asked Slade if he could come along to protect his rear since the taillight on the wrecker was out of order. Slade agreed and followed Hardy's wrecker. En route Hardy took the wrong fork and it was Slade who honked him down and got him back on the right track. At the scene of the bread truck, he did nothing. He denied

he got in the truck or tied down the steering wheel. One lift cable apparently did come loose and he admitted "holding" that in position as the tow was being rigged. As the officers testified, he brought up the rear of the convoy as it proceeded. It was, he insisted, a great shock to learn that in this innocent act to protect highway travelers from the rear of an unlighted wrecker, he was partaking in this movement of contraband.

As this brief resume reflects, the case against Slade depended largely on the circumstances of Slade and Hardy departing from the B & G Truck Stop and Slade's actions in making up the tow. Did Hardy ask Slade to accompany him? Or was Slade the unidentified man who earlier called Hardy and who then told Hardy where the bread truck was? Did Slade actively assist in rigging up the tow, and did he, as observed by the officer, get into the truck and tie down the steering wheel as the officer claimed?

The Government had apparently counted on Hardy as the star witness, and for good reason, as his written statement soon revealed. But Hardy was evasive, equivocal and most unsure on critical points. So much so, that the Court permitted the Government to lay the ground work for claiming surprise and thereafter treating Hardy as a hostile witness. This included specifically identification and introduction in evidence of Hardy's ex parte statement given to Government officers. The statement [1] was direct and categorical in the way it implicated both Slade and Conrad.

Unless positive instructions were given defining a more limited use, it was naturally bound to be effective and per-

---

1. "My name is Douglas P. Hardy and I am 37 years of age. I am a resident of Starke, Florida where I have an auto dealership and have been in business for about six years.

"On the morning of January 1, 1958, at about 12:30 A. M. I received a telephone call to bring my wrecker to the B & G Truck Stop, 2 miles South of Starke, Fla. on U.S. No. 301. I then drove to the truck stop where I met a man known

to me as Truby Slade. Slade asked me to go with him to 2½ miles S. of Waldo, Fla. on U.S. No. 301 to get a truck which had the wheels run off of it. Slade followed me to the truck, as my truck tail lights were not working. During the course of the trip, I turned wrong on the Earlton Beach Road, at which time Slade stopped me and then led me to the truck. Slade showed me the right rear wheel of the truck which was

suasive on these critical issues. But no such instructions were given. And no restrictions were imposed. Counsel for both Conrad and Slade in the jury's absence had registered vigorous opposition to admitting the statement at all. And Conrad's counsel, under circumstances which gave Slade the full benefit of the objection, Gardner v. United States, 8 Cir., 1916, 230 F. 575, 580, and in terms sufficient to form the basis for a claim of error, specifically requested the Court to instruct the jury that the statement was to be considered solely for impeachment to determine the credibility of the witness and not as proof of the facts therein stated. The Court, just before the jury returned at which time the statement would be formally introduced, rejected this in emphatic terms.[2]

After the statement was read into evidence, acknowledged by Hardy to have been signed by him, and Government counsel had cross examined him at length concerning the events described in the

statement and Hardy's oral testimony on those points, the Court reflected adherence to this approach. For he gave a special instruction to the jury which did nothing to indicate that throughout the remainder of the case the jury was to make any special or limited or restricted use of this statement. On the contrary, the implication, at least to the mind of jurors unschooled in the law's distinctions, was that the statement, as would any other testimony, was to be considered by them.[3]

The Judge's preoccupation with Hardy becoming "the Court's witness" was continued in the general charge to the jury. Presumably this was the "charges that the Court will give to you," see note 3, supra. But again there was no direction, affirmatively or negatively, on what the jury was to do with the ex parte statement. Indeed, hearing this sole reference to Hardy, the jury was again justified in thinking that it was for unlimited use.[4]

loose as the studs were broken off. I hooked the truck, 1949 Dodge 1½ ton bread truck, to my wrecker. During this time, a man later known to me as Walter Conrad, came up and told me to follow him to a farm about 6 miles from this location. I then started off, towing the truck, following Mr. Conrad in his 1956 Plymouth hardtop and being followed by Truby Slade in his 1955 Dodge hardtop. We traveled to Orange Heights, Florida where a train came by, forcing me and Slade to wait for it, but Conrad got across the track before the train came and waited for myself and Slade. I then commenced to follow Conrad again after the train had gone by. About ½ mile West of Orange Heights on State Road No. 26, we were stopped by officers of the Florida State Beverage Department. I was told that there was moonshine whisky in the truck I was towing, and this was the first I knew of this. Truby Slade told me at the B & G Truck Stop that the truck he wanted towed did not belong to him, Slade, but belonged to another fellow.

"This statement has been made by me of my own free will and I was not forced to do so. I have read the statement and have had the opportunity to correct it.

"(S.) Douglas P. Hardy,
(Douglas P. Hardy)."

2. "The Court:
"No, sir, I will not give the charge in that form. I will instruct the Jury this. That the witness has given two statements and this is a statement that he admits that he made—that he signed and is placed in writing—and it is up to them to resolve the issue of facts, and that's the purpose of the Jury, as to which statement is true if they in fact find them in conflict. And they will be so instructed. Call the Jury in."

3. The Court stated:
"Members of the Jury, I want to instruct you that this witness was made a Court witness and for that purpose the interrogation took the turn it did. You are not to be concerned with the implications of that—merely to consider the testimony as it comes from the stand and subject later to the charges that the Court will give you."

4. The only reference to the Hardy episode or the ex parte statement in the general charge was this.
"Now in this case, there was one witness who was called originally as a Government witness and subsequently the Court ruled that he would be made a Court witness. All in the world that you are concerned with about that and I only mention this to you so there won't be any mystery about it is that he then was

How the jury regarded this statement is demonstrated beyond question by its own conduct. After apparently extended but inconclusive deliberations, the jury advised the Court it desired to make an inquiry. On return to the courtroom, the jury through the foreman stated their purpose: "We would like to have the statement read signed by Mr. Hardy that was introduced in evidence."

It was here for the first and only time —after the jury had had the statement in their minds during the remainder of the evidence, and after it had been considered in their unsuccessful deliberations—that the Court put any limitations on its use. With obvious and proper concern lest reading this statement might not give it undue prominence, the Court undertook to summarize its legal effect.[5] Just before this, the Court expressly declared that the statement "was admitted in evidence * * * for the sole purpose of impeaching the testimony of Mr. Hardy."[6] But there was still no clear distinction drawn between truth of fact stated therein and the general truthfulness of Hardy as a witness. On the contrary, the reference to impeachment—undefined either in its normal usage or that of its technical legal significance—was followed immediately by equivocal language which seemed to leave this, as was the case with all other fact

findings, to the considered judgment of the jury.[7]

Even more unfortunate, by reference to one specific event described in the statement and Hardy's oral testimony at variance concerning it, the Court inadvertently used language indicating strongly that Hardy affirmed the truthfulness of his written statement and "that this version coming from his written statement was true and correct." The Government concedes that Hardy did no such thing. Treated by the jury as a declaration of law, it was simply incorrect. Treated as an expression of the Judge's opinion, which in a Federal Court he may rightfully express, it failed to carry the caveat that the Court's opinions were not binding and the jury was free to determine it on their own.

With this supplemental charge and a paraphrase of the frequent charge concerning the jury's duty to reach a decision if possible, Allen v. United States, 1896, 164 U.S. 492, 501, 17 S.Ct. 154, 41 L.Ed. 528, the jury was sent out to recommence its deliberations and shortly returned a verdict of guilty against defendants on both counts.

■ This record demonstrates that we do not have here the situation of an ex parte statement, introduced as a prior inconsistent statement and then used in the examination of the recalcitrant or

---

allowed to be questioned by the parties who called him to help bring out the truth of his statement, whatever it may be, and for whatever value you may want to give it. That procedure is not a matter for your consideration. Ordinarily the party who calls and questions the witness is charged with the answers given. In this case this witness was made a Court witness through the ruling of the Court."

5. "In answer to your specific questions, the Court will merely comment that the evidence in this case showed that Mr. Hardy upon his original testimony made certain statements which were materially different from those in the written statement Government exhibit number one."

6. "It was admitted in evidence in this case for the sole purpose of impeaching

the testimony of Mr. Hardy who took the stand as a Government witness and proceeded to testify. Subsequently the Court ruled he should be made a Court witness and this statement was allowed as a matter of impeachment going to his credibility; whether he was telling the truth when he was first called on the stand or not."

7. "Now, with reference to that [the statement] that's about all I can say to you. That evidence along with all the other evidence in the case has to be considered by you and your having asked about that particular portion of it however, and my having mentioned it here from the bench again, is not to be given any more or less weight than you properly think it belongs to have and deserves in relationship to all the evidence than went in for your consideration."

hostile witness, with the witness finally affirming the truthfulness and correctness of the statement, rather than the initial, oral Court testimony. When that takes place, the statement is effectually embraced by the witness, becomes a part of his oath-supported court-given testimony subject to cross examination, and is therefore not hearsay. Feutralle v. United States, 5 Cir., 1954, 209 F.2d 159, 162; Harman v. United States, 4 Cir., 1952, 199 F.2d 34; cf. United States v. Allied Stevedoring Corp., 2 Cir., 1957, 241 F.2d 925, 932, and Di Carlo v. United States, 2 Cir., 1925, 6 F.2d 364, 368; and see McCormick, Evidence § 39 (1954).

■ This was rather the classic case of court testimony at variance with the statement, and as to which it is "fundamental that the impeaching testimony be admitted not for the purpose of supplying what the witness was expected to, but did not, say, * * * but only to eliminate from the jury's mind any positive adverse effect which might have been created by the testimony * * *" of the witness. Young v. United States, 5 Cir., 1938, 97 F.2d 200, 205, 117 A.L.R. 316, 323. We have in many cases, civil and criminal, reiterated the controlling principle that such prior inconsistent statements are " * * * admitted only to destroy the credit of the witnesses, to annul and not to substitute their testimony. An ex parte statement does not become evidence of its contents * * *." New York Life Insurance Co. v. Bacalis, 5 Cir., 1938, 94 F.2d 200, 202. See also Laird v. Air Carrier Engine Service, 5 Cir., 1959, 263 F.2d 948, 951; Tropical Marine Products, Inc. v. Birmingham Fire Ins. Co., 5 Cir., 1957, 247 F.2d 116, 119–120, note 8; McCormick, op. cit. supra; and 3 Wigmore, Evidence § 1018 (3d ed. 1940).

We need not determine in this case whether, and if so, to what extent, we would join Judge Learned Hand in the somewhat critical observations on the traditional limitations upon the use of prior inconsistent statements, United States v. Allied Stevedoring Corp., supra, Di Carlo v. United States, supra.

But we have acknowledged, as have many others, that the legal distinction between using a statement to destroy credibility and to establish the stated fact "is a fine one for the lay mind to draw." Dowell, Inc. v. Jowers, 5 Cir., 1948, 166 F.2d 214, 219, 2 A.L.R.2d 442, certiorari denied 334 U.S. 832, 68 S.Ct. 1346, 92 L. Ed. 1759.

■■ This distinction should be delineated sharply in terms readily understandable by the jury. It is not done by simply stating that it is to be used "as a matter of impeachment going to his credibility" or the further suggestion that it is to be used to determine whether Hardy "was telling the truth when he was first called on the stand or not." Note 6, supra. Assuming the jury understood what was "impeachment going to his credibility" the instruction did not advise the jury what they were to do if, as the charge permitted, they determined that the ex parte statement showed Hardy was untruthful on the witness stand. Nothing forbade its further use to establish the critical facts at issue and therein stated categorically. "[W]hile the court stated that they were offered for impeachment [purposes] only, this was all that was said, and the jury was allowed to take the whole matter without explanation or instructions as to what was meant by 'for impeachment purposes only.'" Young v. United States, supra, 97 F.2d 200, at page 207.

As to this distinction "we think the trial judge should have drawn it carefully and explicitly in his charge to the jury by an explanation more detailed than the brief charge given" here. Dowell, Inc. v. Jowers, 5 Cir., 1948, 166 F.2d 214, 219, supra. And in these circumstances that is done only if the court clearly "instructs the jury that the impeaching evidence is not admitted as evidence in the offeror's favor but merely to destroy the credit of the witness, to remove the damage caused by the surprise * * *" and suitably cautions " * * * the jury that the contradictory statements could have no legal tendency to establish the truth of their subject-

**840**

matter." Culwell v. United States, 5 Cir., 1952, 194 F.2d 808, 811. Young v. United States, 5 Cir., 1938, 97 F.2d 200, 205, 207, 117 A.L.R. 316, 323, 325.

In view of this, we need not assay the record on the sufficiency of the evidence to sustain the verdict of guilty. If, apart from the possible misuse of the statement, the evidence was not adequate, the circumstances of the case certainly require a reversal and remand for new trial for the proper development of the available evidence, Bryan v. United States, 1950, 338 U.S. 552, 70 S.Ct. 317, 94 L.Ed. 335, affirming 5 Cir., 1949, 175 F.2d 223; Gilmore v. United States, 5 Cir., 1959, 264 F.2d 44, 46, and not the reversal and rendition of a judgment of acquittal here.

Reversed and remanded for new trial.