**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Manuel Ricardo GARCIA and Niceforo Gutierrez-Saenz,
Defendants-Appellants.**

**No. 75–3543.**

United States Court of Appeals,
Fifth Circuit.

April 21, 1976.

**651**

L. Aron Pena, Edinburg, Tex., for Garcia.

Homer Salinas, Robert Salinas, Mercedes, Tex., Phil Harris, Weslaco, Tex., for Saenz.

Edward B. McDonough, Jr., U. S. Atty., Anna E. Stool, Asst. U. S. Atty., Houston, Tex., for plaintiff-appellee.

Before GEWIN, COLEMAN and GOLDBERG, Circuit Judges.

COLEMAN, Circuit Judge.

This is the story of a pound of heroin which swam the Rio Grande and sent four men to prison. Two pleaded guilty. Two others were tried and convicted. They appeal. We affirm as to both appellants.

Gutierrez-Saenz [Saenz] and Garcia were convicted of possessing heroin with intent to distribute and of conspiring to possess heroin intending to distribute it, 21 U.S.C., §§ 841(a)(1) and 846. The overt act charged in the conspiracy count was the delivery of approximately seventeen ounces of heroin on or about May 6, 1975. Garcia was also convicted of carrying a firearm during the commission of these offenses, 18 U.S.C., § 924(c)(2).

Indicted along with appellants were Octavio Gama-Marron [Marron], David Ramiro Garza, Noe Sanchez, and Fausto Carrion. Marron and Sanchez pleaded guilty. Carrion was dismissed by the government. The District Court directed a judgment of acquittal in favor of Garza.

Saenz was sentenced to eight years for possession and eight years for conspiracy, to run concurrently, plus concurrent special parole terms of five years on each count. Garcia was assessed concurrent eight year terms for each of his three convictions, with concurrent special parole terms of five years.

I. *The Scenario*

In the spring of 1975, Drug Enforcement Administration agent Foster J. Watkins sought to apprehend drug dealers in South Texas by posing as a purchaser of illicit drugs. After expressing an interest in narcotics to Noe Sanchez, Watkins met Sanchez May 4, 1975, in Madero, Texas, to obtain a small sample of heroin. Sanchez informed Watkins that the sample came from a pound of heroin owned by an acquaintance who owned or lived in a bar in Sullivan City, Texas. The trial revealed that the source of the sample was Garcia. Satisfied that Sanchez's sample was actually heroin, Watkins told Sanchez he was interested in doing business with the bar

owner, but that he preferred not to deal in the bar for fear that his money might be stolen before the deal could be completed.

On May 5, Watkins and Sanchez met again and drove to the Sullivan City bar, Balde's Place, to ask the bar owner-dope dealer where, other than Balde's, the deal might be consummated. The trip was fruitless, for the bar was closed when they got there.

Watkins and Sanchez met again on May 6. Sanchez then went to Balde's Place, where he conferred with the bar owner about the feasibility of an exchange somewhere other than at the bar. To learn the outcome of the negotiations, Watkins was to call the phone number which Sanchez had given him earlier. The phone book revealed that number to be Balde's Place, the Sullivan City bar. The bar owner agreed to deal elsewhere, so Sanchez and Watkins arranged a 2:00 p. m. meeting to decide the time and location for the sale.

Sanchez and Watkins agreed that the exchange would take place at 5:00 p. m. that same day at the home of Sanchez's girlfriend, Marisa Foley. Watkins told Sanchez he would bring a companion, a money man, traveling in a second car as a safeguard.

After the meeting Watkins returned to his office, where plans were hurriedly made for surveillance teams. Agent Lex Henderson was to pose as the money man.

Marisa Foley's home was situated on a dirt road, off Route 1016, near Mission, Texas. As agents Watkins and Henderson approached in separate cars at the appointed time they encountered two lookouts at the intersection of Route 1016 and the dirt road. These lookouts, Yolanda Fernandez and Fausto Carrion, told Watkins to go on in because the dealers (having arrived earlier in two cars) were waiting for them. Money man Henderson would, of course, be constantly communicating with surveillance agents over a two-way radio, so Watkins warned the lookouts that Henderson was under orders to protect the money, if approached, by bolting or by shooting the intruder. The agents went down the dirt road to the Foley home, Henderson stopping about fifty yards behind Watkins' car.

Watkins had anticipated the presence of only Sanchez and the bar owner but there were five men in the Foley yard. They were Garcia, Saenz, Sanchez, Marron, and Garza. Sanchez approached Watkins' car and said, "Come on in; come on in, Joe. They've been here. They are waiting, they are in a hurry. Let's do the deal." When Watkins asked about all the people, Sanchez said, "Don't worry, Joe. They are cool. They had been waiting. Come on, hurry."

The two cars used by the five to reach the Foley home were parked in the driveway. Marron *and the heroin* (under the front seat of the car) had been driven to the scene by Saenz in his light tan Chevrolet. Garza and Garcia, part owner of Balde's Place, had arrived in Garcia's dark blue, late-model Chevrolet.

As Watkins approached the group, Garcia spoke to Marron in Spanish, ordering him to remove the heroin from the Saenz vehicle. Marron got the heroin from beneath the front passenger seat, and it was given to Watkins. Watkins knelt to the ground to open the package and inspect the goods. As he did, the entire group gathered around to watch, and someone said, "Hurry up and open the package. Go on, open it." Garcia added, "It's good stuff, man. We want to do business; we can do a kilo a week if you want that much."

Watkins told the group he would walk back to Henderson's car and would return with Henderson and the money. Watkins went to Henderson's car; Henderson alerted surveillance to come in for the arrest. Watkins returned with Henderson and the money. During the money exchange which followed, Garcia and Sanchez dealt with Watkins and Henderson while the other three stood near the cars. Twice during the exchange, Marron started from the cars toward the Watkins-Henderson-Garcia-Sanchez group. Each time Garcia said something to Marron, and he turned back.

When the surveillance agents were slow to arrive, Henderson arrested Garcia and Sanchez; Watkins arrested Marron, Garza, and Saenz. When arrested by Henderson, Garcia told the agent that he had a weapon in his boot, from which Henderson removed a .357 magnum Colt, loaded with soft lead-nosed bullets in copper jackets.

The surveillance team arrived as the arrests were effected, and the arrestees were forthwith transported to jail. DEA Agent Horacio Ayala drove Marron, Saenz, and Garza. En route, Marron said that it was his heroin and that the others in the car were innocent.

### A. What Marron Told Agent Ayala

After arriving at the jail, however, agent Ayala took Marron aside and told him not to protect other guilty parties. In response, Marron told Ayala that Garcia had approached him for drugs months before, when Marron was unable to supply them. A couple of days before the arrest, however, Garcia approached him again for the pound of heroin subsequently "sold" to agent Watkins. To get this heroin, Marron went to Saenz, who lived across the Rio Grande in Mexico. Saenz agreed to supply the heroin and offered Marron $500 to swim the contraband across the Rio Grande River from Mexico to Texas. On the day of delivery to Watkins, Marron swam the drugs across and Saenz picked him up on the Texas side of the river in his tan Chevrolet. Saenz then drove Marron and the drugs to the Foley house to await Watkins.

### B. What Marron Told the Jury

When called as a witness for the prosecution Marron swore to a different version. He did reiterate that Garcia had asked him to arrange the deal. He denied that Saenz had supplied the heroin, swearing that an unidentified person, named Jose, gave him the heroin in Mexico. He denied that Saenz even knew of the arrangements. Marron confirmed

that Saenz had been told to pick him up on the Texas side of the Rio Grande; he admitted that Saenz had thereafter driven him to Balde's Place to tell Garcia and Garza that the drugs had been secured. Moreover, he admitted that Saenz drove him from the bar to the Foley home for the exchange while Garcia and Garza simultaneously made the same trip in Garcia's car. Nevertheless, Marron denied that Saenz knew what was happening. Marron further maintained that although he, the witness, put the package under the car seat during the drive to Foley's, Saenz might not have even seen the package containing the one pound block of heroin.

Marron's about face surprised the prosecution. Indeed, Marron had altered his statements during his pre-trial incarceration, but he had intimated that his trial testimony would tally with his earlier discussion with agent Ayala. To impeach Marron, the prosecution called Ayala to relate Marron's prior inconsistent statements. In addition, Ayala testified that before Marron took the witness stand he approached Ayala in the hall and apologized for hedging on his earlier statements. Marron said he had lied out of fear for himself and family at the hands of Saenz and his friends.

Saenz's counsel objected to the prior inconsistent statements as hearsay and also objected to the government impeaching its own witness, an objection which was correctly overruled, Fed.Rules Evid., Rule 607, 28 U.S.C.[1] Garcia's attorney voiced the same objection and got the same ruling. Defense counsel did not ask the Court to instruct the jury that Ayala's testimony was not substantive evidence and was admitted solely as impeachment. No such instruction was given at any point in the trial and no point was ever made about the omission.

### C. The Jury Deliberations

Approximately an hour after the jury began deliberating, it returned to the

---

1. The Rule came into effect July 1, 1975. The trial of this case began on July 21, 1975. The Rule reads as follows:

The credibility of a witness may be attacked by any party, including the party calling him.

courtroom, where the following exchange occurred:

THE COURT: Members of the jury, I have this note from your foreman, Mr. Perez, that you ask, "We, the jury, would like to know if we can't agree on a verdict, can it be stated 'undecided'?"

I want to tell you if you can't decide on whether a person is guilty or not guilty you just leave it blank.

I would like to confer with you, Mr. Perez, if you all have reached by unanimous verdict any decision on any other count against any of these defendants?

THE FOREMAN: No, Your Honor, we are still working on Count One on Niceforo Gutierrez [-Saenz].

THE COURT: And you haven't worked on the other one yet?

THE FOREMAN: No sir.

THE COURT: Well, your verdict has to be a unanimous verdict on each one of the counts, against each of these defendants, and you all have not been deliberating very long, so I recommend that you go back and continue your deliberations.

THE FOREMAN: Yes sir.

THE COURT: Go back and continue your deliberations.

Another hour of deliberation followed. After which the jury returned with another query as follows:

THE COURT: Members of the jury, I have the request of your foreman, "We, the jury, would like to listen to the testimony of Octavio Gama-Marron referring to Niceforo Gutierrez [Saenz]' involvement".

And I have asked the court reporter to look up the testimony of Mr. Gama-Marron so that he can read it all to you.

(The court reporter at this time read all the testimony of the witness Octavio Gama-Marron.)

THE COURT: All right, file this note.

Fifteen minutes after again retiring, the jury returned with verdicts of guilty.

## II. *The Grounds for Appeal on behalf of Saenz*

■ On this appeal, Saenz assigns only one ground for reversal: "Did the District Court commit reversible error in admitting an oral out-of-court declaration by a co-conspirator made after arrest and after termination of the conspiracy against appellant who was alleged to be a co-conspirator of declarant?"

Thus he sticks with the objection futilely raised in the trial court. It is said that since the out-of-court assertions of Marron occurred after the arrest they were not made in furtherance of the conspiracy, thus inadmissible hearsay, Fed.Rules of Evidence, Rule 801(d)(2)(E), 28 U.S.C.

This contention misses the point because the testimony was not offered to prove the truth of what Marron told Ayala but to attack the credibility of his testimony as given from the witness stand.

Thus it is that the only viable issue in Saenz's appeal is whether this Court, *sua sponte*, should notice the failure to give the limiting instruction on the impeachment testimony and, if noticed, whether the failure amounted to *plain error*.

In this Circuit we begin with *Slade v. United States*, 5 Cir., 1959, 267 F.2d 834, 839. That was a case in which a witness testified inconsistently with a prior written statement. The prior statement was admitted for impeachment purposes only. Of this we said, *inter alia.*

This was rather the classic case of court testimony at variance with the statement, and as to which it is "fundamental that the impeaching testimony be admitted not for the purpose of supplying what the witness was expected to, but did not, say, * * * but only to eliminate from the jury's mind any positive adverse effect which might have been created by the testimony * * * *" of the witness. *Young v. United States*, 5 Cir., 1938, 97 F.2d 200, 205, 117 A.L.R. 316, 323. We have in many cases, civil and criminal, reiterated the controlling princi-

ple that such prior inconsistent statements are " * * * admitted only to destroy the credit of the witnesses, to annul and not to substitute their testimony. An ex parte statement does not become evidence of its contents * * *." *New York Life Insurance Co. v. Bacalis,* 5 Cir., 1938, 94 F.2d 200, 202. See, also *Laird v. Air Carrier Engine Service,* 5 Cir., 1959, 263 F.2d 948, 951; *Tropical Marine Products, Inc. v. Birmingham Fire Ins. Co.,* 5 Cir., 1957, 247 F.2d 116, 119–120, note 8; McCormick, op. cit. supra; and 3 Wigmore, Evidence § 1018 (3d ed. 1940).

We need not determine in this case whether, and if so, to what extent, we would join Judge Learned Hand in the somewhat critical observations on the traditional limitations upon the use of prior inconsistent statements, *United States v. Allied Stevedoring Corp.,* supra, 2 Cir., 241 F.2d 925 *Di Carlo v. United States,* supra, 2 Cir., 6 F.2d 364. But we have acknowledged, as have many others, that the legal distinction between using a statement to destroy credibility and to establish the stated fact "is a fine one for the lay mind to draw." *Dowell, Inc. v. Jowers,* 5 Cir., 1948, 166 F.2d 214, 219, 2 A.L.R.2d 442, certiorari denied 334 U.S. 832, 68 S.Ct. 1346, 92 L.Ed. 1759.

This distinction should be delineated sharply in terms readily understandable by the jury.

\* \* \* \* \* \*

And in these circumstances that is done only if the court clearly "instructs the jury that the impeaching evidence is not admitted as evidence in the offeror's favor but merely to destroy the credit of the witness, to remove the damage caused by the surprise * * *" and suitably cautions " * * * the jury that the contradictory statements could have no legal tendency to establish the truth of their subject-matter." *Culwell v. United States,* 5 Cir., 1952, 194 F.2d 808, 811. *Young v. United States,* 5 Cir., 1938, 97 F.2d 200, 205, 207, 117 A.L.R. 316, 323, 325.

In *Slade,* however, the defense not only vigorously objected to the statement, but specifically requested the appropriate instruction. Therefore, *Slade* was not a *plain error* case.

We next encounter the brief, but expressive, *per curiam* in *Upham v. United States,* 5 Cir., 1964, 328 F.2d 661:

During the trial of this Mann Act case the victim testified differently than she had previously indicated she would and contrary to a written statement signed by her. After an initial effort to get her to recant her testimony unfavorable to the prosecution, the United States Attorney let her depart from the witness stand. Thereafter, when the FBI agent who took her initial statement was on the stand, the Government had the victim's statement identified and tendered it in evidence. It was received without limitations on the purpose for which it could be considered and without objection. It was an extremely damaging statement. While appellant's counsel did not request an instruction that the statement be considered only as impeaching the witness, the need for such a charge to the jury was so obvious and the failure to give it so prejudicial to the appellant that this Court must notice the failure as "[p]lain errors * * * affecting substantial rights" of the accused under Rule 52(b) F.R.Crim.Proc.

On the other side of the coin, we see *United States v. Clark,* 5 Cir., 1973, 480 F.2d 1249, *cert. denied* 414 U.S. 978, 94 S.Ct. 301, 38 L.Ed.2d 222. There, an impeaching letter tended to place a defendant at the scene of the crime and thus to destroy an alibi defense. There was no *Slade* instruction and no request for one. We declined to classify this as plain error.

Finally, in *United States v. James,* 5 Cir., 1975, 505 F.2d 898, *cert. denied,* 421 U.S. 1000, 95 S.Ct. 2397, 44 L.Ed.2d 667, we laid down the following:

Appellant claims next that he was entitled to an instruction on the limited use of impeachment evidence used

by the prosecutor. No such instruction was properly requested by trial counsel, and thus a plain error holding would be essential to a decision to reverse. Fed.R.Crim.P. 52(b). While we have noted the desirability of instructing juries as to the limited purposes for which impeachment evidence is admitted, *e. g., Slade v. United States*, 5 Cir., 1959, 267 F.2d 834, we have not held that the failure to give an instruction *sua sponte* automatically results in reversible error. *See Valentine v. United States*, 5 Cir., 1959, 272 F.2d 777, 778. We decline to do so now. Rather, we note that the impeachment complained of related to the testimony of witnesses whose testimony, at best, would have been cumulative. A damning case had already been presented by the Government. Under the facts and circumstances of this case, the lack of an instruction was not so critical as to affect the substantial rights of the appellant. *See United States v. Helms*, 5 Cir., 1972, 467 F.2d 1085.

We do not leave unnoticed Rule 105 of the Federal Rules of Evidence:

Rule 105. Limited Admissibility

When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly.

This rule, as read on its face, would seem to define the duty as being one to instruct *upon request*, and there was certainly no request on behalf of Saenz. Nevertheless, this Circuit obviously adheres to the rule that in certain circumstances the failure to give a *Slade* instruction amounts to plain error. Plain error appears only when the impeaching testimony is extremely damaging, the need for the instruction is obvious, and the failure to give it is so prejudicial as to affect the substantial rights of the accused, *Upham v. United States, supra.*

Leaving the Ayala testimony to one side, the prosecution proved:

(1) On the day of the exchange, Saenz drove his automobile to the Texas side of the Rio Grande River where he picked up Marron, who had just crossed the river with the heroin.

A jury would be justified in believing that the rendezvous on the Rio Grande could not have occurred except by pre-arrangement and that Marron could hardly have secreted the heroin package under the car seat without Saenz observing it.

(2) From the border, Saenz drove Marron to Balde's place, where Garcia was informed that the heroin had been secured.

(3) Saenz did not leave Marron at that point. Although Garcia and Garza went to the Foley home in a car which had adequate room for Marron and the heroin, Saenz stayed with the operation. He drove Marron and the heroin to the sale site and witnessed the transaction. The jury could reasonably infer that Saenz had an interest to protect and that the other participants would hardly have acted in his presence had he not been privy to the transaction.

Finally, Saenz, a Mexican resident, would hardly have chanced trying to smuggle the heroin through customs.

We now turn to the possible prejudicial impact of Ayala's testimony. It is to be noted that the jury did not precipitately convict Saenz; it acted deliberately and carefully. If the testimony about Saenz promising to pay $500 for the swim across the Rio Grande had been accepted as credible substantive evidence it should be expected that the jury would have convicted Saenz out of hand.

Even more significantly, the jury asked to hear Marron's testimony the second time *but it did not ask for a repetition of Ayala's testimony.* Finally, after hearing Marron the second time, the conviction came in fifteen minutes.

Consequently, we must hold that the failure to give the *Slade* instruction did not amount to plain error in this case and Saenz's conviction must be affirmed.

### III. *Garcia's Appeal*

Garcia also attacks the admission of Ayala's testimony and raises two additional grounds for reversal: The evidence was insufficient to support his conviction and improper criteria were used in assessing the penalty.

Ayala's testimony was not introduced for the purpose of impeaching Garcia. It had no impact on him whatever. His contention that the evidence was insufficient to support his conviction is frivolous. The evidence shows that he was a main wheel in the deal.

A careful scrutiny of the record reveals that the argument concerning the sentence is also devoid of merit. See *Thomas v. United States*, 5 Cir., 1966, 368 F.2d 941; *United States v. Rodriguez,* 5 Cir., 1974, 498 F.2d 302.

Garcia's conviction must be affirmed.

The judgment of the District Court as to both Nicefero Gutierrez-Saenz and Manuel Ricardo Garcia is

AFFIRMED.