Edward David EISENBERG, Appellant,

v.

UNITED STATES of America, Appellee.

No. 17873.

United States Court of Appeals Fifth Circuit.

Dec. 17, 1959.

Julius Lucius Echeles, Chicago, Ill., Thomas M. Haas, Mobile, Ala., for appellant.

Ralph Kennamer, U. S. Atty., Mobile, Ala., for appellee.

Before RIVES, Chief Judge, and BROWN and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

This is a Mann Act case. The so-called "victim" is Mrs. Jean Eisenberg. The defendant is her husband, Edward Eisenberg, sentenced to four years imprisonment for "knowingly, wilfully and unlaw-

fully transport[ing]" his wife on December 7, 1958, from New Orleans to Mobile "for the purpose of prostitution".[1]

The appeal turns on the question of the admissibility of an unsworn, out-of-court statement introduced by the prosecution without a predicate, over the objection of defense counsel, and used as substantive evidence against the defendant. The victim made the statement to an FBI agent out of the presence of her husband at a time when she was hostile to her husband. On the stand she repudiated the statement. The trial judge gave no instructions limiting its effect when the statement was admitted, when it was sent to the jury room, or in his charges to the jury.

The prosecution presented two witnesses. Joel Colglazier, an FBI agent at Mobile, testified briefly that sometime between November 10 and November 16, 1958 he saw the Eisenbergs at a place known to be a house of prostitution. That was the total extent of his testimony. The statement was made to him but he did not testify as to the statement. The other witness was Mrs. Eisenberg.[2] On the whole, her testimony is inconsistent with her statement and supports the defendant's contention that he did not take her to Mobile for the purpose of prostitution.[3] Without the benefit of the unrestricted use of the statement the evidence for the prosecution is too thin to support the verdict.[4]

1. 18 U.S.C.A. § 2421.

2. At the trial Mrs. Eisenberg's attorney objected to her testifying. Her husband, with whom she was living at the time of the trial, made no objection to her testifying. The district judge ordered her to testify, relying on Wyatt v. United States, 5 Cir., 1959, 263 F.2d 304, certiorari granted 1959, 360 U.S. 908, 79 S.Ct. 1299, 3 L.Ed.2d 1259. cf. Hawkins v. United States, 358 U.S. 74, 79 S.Ct. 136, 3 L.Ed.2d 125.

3. Mrs. Eisenberg testified that she had no discussion with her husband in New Orleans in regard to any contemplated prostitution. His actions were those of a man primarily concerned about his child. He did not seek her out; she sought him. He did not want to go to Mobile; she did. He wanted to go to Houston. She was the moving party in going to Mobile, and she did not intend to return to prostitution.

4. Eddie Eisenberg is thirty-three years old. He has never before been in any trouble with the law. He has been an automobile salesman since he was eighteen. There is no evidence that he was engaged in the business of prostitution. He is a man of some ability in his line, for at the time of the trial he was making from $250 to $350 a week as general manager of a used car lot in Chicago. He married Jean in Miami, Florida, in July, 1957. At the time, he was managing "a new car place". She was a model. March 29, 1958 the Eisenbergs had a daughter. Eddie worked in Miami until the child was born, then worked out of Fort Walton Beach, near Valparaiso, where Jean's mother lived. He gave up his Miami job to "keep [the] family intact", since Jean wanted to stay in her home town. In August Eddie went to Mobile. He had been recommended as an automobile salesman to Big Standard Motors in Mobile and was given the job immediately. He supported his family in Florida until Jean moved to Mobile in October, leaving the baby with her mother.

On November 10, 1958 Eisenberg and his employer severed relations over a dispute about commissions. About that time or a little before the Eisenbergs had met Sonny Hendrix and Anita Hendrix, a prostitute. Jean had never worked as a prostitute. On several occasions Sonny Hendrix and his wife had suggested that Jean become a prostitute. On only one occasion was there such a discussion in Eddie's presence. He testified that he "took it with a grain of salt and more or less laughed it off". Money was running short, however. Jean went to work as a prostitute. Eddie acquiesced, supposedly, or so he testified, because his wife is "a very headstrong person and she will do as she pleases, and the minute she mentioned it the handwriting was on the wall".

Jean plied her trade for about a week at Connie Russo's Westwood Club in Mobile. The defendant testified, for what it is worth, that he "could not stop her from doing what she wanted to do". At the end of the week she took off for Austin, Texas in the company of a Mr. Musgrove, a stranger to Eddie. The defendant called his mother-in-law and told her that he wanted to see the baby, but did not tell her what Jean had done. Next, he consulted Joel Colglazier of the FBI

During the direct examination of Mrs. Eisenberg, the counsel for the prosecution prefaced a number of questions with the phrase, "to refresh your recollection". Presumably, the United States Attorney had Mrs. Eisenberg's written statement before him in full view of the witness and the jury. It is not surprising that defense counsel should request the district court to instruct the Government to turn over to the defense any written statements made by the witness. It is also not surprising that defense counsel should feel compelled to attempt to offset the adverse effect of the Government's tactics. Thus, the defense showed that the statement was made at a time when the Eisenbergs had been drinking heavily and were in the middle of a bitter quarrel. In the course of the quarrel the defendant had roughed up his wife, had packed up his bags to leave, and had threatened to take their baby with him to New Orleans (he had done so once before). On his wife's complaint, he was picked up by the police at the baby's

---

office in Mobile, told him the whole story, and asked for advice concerning his child. He contends that Colglazier told him to take the baby and make a new life for himself. Eddie went to Valparaiso, took the baby from Jean's mother, and then drove to New Orleans. He found a reputable nursery through one of the churches and put his child in an accredited foster home. He visited the child frequently. He called the FBI agent in regard to his wife. Again the defendant found a job as an automobile salesman.

Meanwhile, Jean's life with Mr. Musgrove was grim. Musgrove put her in a house of prostitution in Austin, and abused and beat her. She was arrested, fined, but went back to the house. After about two weeks in Texas Jean learned from her mother what had happened to the baby, obtained her husband's address, and flew to New Orleans. Jean's mother telephoned Eddie, told him that Jean was sorry and wanted to go back to him, and asked him to come and bring the baby to Valparaiso. In New Orleans Jean checked in a hotel and promptly called her husband. A reconciliation followed.

The Eisenbergs decided to leave New Orleans. Eddie wanted to go to Houston; Jean wanted to return to Mobile. According to his testimony, he told her that he did not want a prostitute as a wife, and he did not need money from her. He finally yielded to her desire to return to Mobile, but not with the intention of having her return to prostitution. Eddie rented a car in Jean's name, because—so the prosecution says—they were afraid of a Mann Act violation. Not so, says the defendant; his driver's license had expired.

December 7, 1958, Eisenbergs and child left New Orleans for Mobile. They stayed in a motel and placed their child in a nursery. Eddie looked for a job as a car salesman, but he did not find a job; at any rate he did not work. Notwithstanding their good resolutions, if any,

Jean went back to work for Russo, presumably as prostitute.

The Eisenbergs drank heavily and quarreled heatedly. The Government implies that the quarrels were over his gambling away her earnings; the defendant stated that it was because he was "fed up" with his wife's activities. He said that he "had had it, this was it, [he] didn't want it anymore". The night before his arrest, he packed his bags with intention of leaving his wife. His wife's customary cab driver called at the usual hour of two in the morning and informed him that his wife wanted to see him at the Mystic Lounge. After a few harsh words between them, and either slaps or blows from Eddie that may have caused her to fall, they returned to their apartment to "iron things out". At about 3:30 A.M. Jean suggested going back to the Mystic Lounge to have "a couple of drinks for good luck" since Eddie was leaving. They did. According to her husband, "she went to work drinking". About 5 A.M. Jean disappeared. His first thought was that she intended to "grab the baby and go back to her mother"; so, Eddie went to the baby's foster home and asked if his wife had been there. The woman who owns the home said that his wife had called. He decided to wait. The police called him from the Mystic Lounge. He called back and asked for his wife. His wife answered the telephone and, allegedly, stated that she was afraid that he would beat or kill her. He threatened to take the baby. At 7:30 A.M. police arrested him. Jean too was picked up. It was at this time that Jean made the written statement to FBI agent Colglazier.

After Eddie was released on bond, there was another reconciliation. They moved to Chicago with their child and lived as man and wife. Eddie managed a used car lot. Jean did not work as a prostitute. They came to Mobile together for the trial.

temporary foster home. On cross-examination, Mrs. Eisenberg testified that the statement was made in a fit of anger and was not true.

Mrs. Eisenberg's statement was offered in evidence as Government Exhibit 1, over the objection of defense counsel.[5] The jury realized fully the importance of the statement. As soon as the defense rested, a juror asked to see the statement. The district judge replied: "Yes, it is in evidence. You will take it with you to the jury room."

■ The orthodox view is that when a witness takes the offering side by surprise [6] and alters his story, a prior inconsistent statement is admissible for impeachment purposes but not as substantive evidence of the facts stated. "[T]he contradictory statements can have no legal tendency to establish the truth of the subject-matter." Southern Railway Co. v. Gray, 1915, 241 U.S. 333, 337, 36 S.Ct. 558, 560, 60 L.Ed. 1030. See Ellis v. United States, 8 Cir., 1943, 138 F.2d 612; United States v. Michener, 3 Cir., 1945, 152 F.2d 880; Young v. United States, 5 Cir., 1938, 97 F.2d 200; 133 A.L.R. 1454 (1941). And, "if the only evidence of some essential fact is such a previous statement, the party's case falls". McCormick, Handbook of the Law of Evidence 73 (1954).

In United States v. Biener, D.C.E.D. Pa.1943, 52 F.Supp. 54, 56, a similar case involving the Mann Act, where the only witness for the prosecution was the victim who repudiated an out-of-court statement, the court allowed a motion in arrest of judgment. The court stated:

"Without this prior contradictory statement, however, the government has no testimony to sustain the guilt of the defendant. Under the reported decisions, evidence of the prior contradictory statement can be used only to discredit the witness' present testimony and cannot be treated as affirmative proof of fact for any other purpose." Citing Young v. United States, 5 Cir., 1938, 97 F.2d 200 and Southern Ry. Co. v. Gray, 1915, 241 U.S. 333, 36 S.Ct. 558, 60 L.Ed. 1030.

It is not clear from the record why either the United States Attorney or the trial judge considered the statement admissible. At no time did the United States Attorney take the position that he was taken by surprise, that Mrs. Eisenberg was a hostile witness, and that the statement was admissible as a prior inconsistent statement for purposes of impeachment. Of course, the prosecution was in a dilemma. It could afford to impeach only her unfavorable testimony.

---

5. The colloquy was as follows:

"Mr. Kennamer: I offer the statement in evidence as Government Exhibit 1."

"Mr. Haas: I object. The witness is here to testify. There is no purpose shown for admission of this so called statement that the witness made. She is here and the Jury has the benefit of her being here."

"Mr. Kennamer: He requested the statement and cross examined her about it. He has left the inference that there were some differences in the statement, that she was drunk at the time the statement was made, and I think it would be beneficial for the Jury to have the written statement and compare it with her testimony today."

"Mr. Haas: I object to Mr. Kennamer saying that I made any inferences of any sort whatsoever. I have not made any inferences. The law is that if the

witness is here, no statement is admissible, except for certain set purposes. The United States Attorney has not named them."

"Mr. Kennamer: I am naming them right now."

"Judge Thomas: Objection overruled."

"Mr. Haas: Exception."

Thereupon, said statement was marked Government Exhibit 1.

6. Prior inconsistent statements cannot be used to impeach without a showing of damage and surprise. McCracken v. Richmond, Fredericksburg & Potomac R. Co., 4 Cir., 1957, 240 F.2d 484; Ward v. United States, 5 Cir., 1938, 96 F.2d 189. For other cases adhering to the general rule that there must be a showing of surprise see annotated cases in 117 A.L.R. 326 (1938).

The inference to be drawn from the record, particularly from the repetition of the phrase "to refresh your recollection", is that the United States Attorney regarded the statement not as contradictory but as consistent with her testimony.

At the time the statement was offered, the United States Attorney argued that it was admissible on the ground that the defense counsel had requested the statement and examined Mrs. Eisenberg on the statement. Defense counsel, however, did not request the statement or cross-examine Mrs. Eisenberg in regard to it, until after numerous references had been made to the statement by the prosecution, particularly through the foreboding phrase, "to refresh your recollection". The defense counsel's well-grounded fear that the statement would be offered and his proper efforts to protect his client by showing the circumstances under which the statement was given were no license for the admissibility of the statement.

In its brief the Government contends that the statement was used to refresh Mrs. Eisenberg's recollection, and besides the jury called for the statement. We consider that, as used in this case, a prior inconsistent statement is inadmissible for the purpose of refreshing the recollection of the witness.[7] The statement was not used by the witness herself, as is usually the case with memoranda to revive recollection. There is no pretense that the memory of the witness had dimmed or that she needed to refer to any out-of-court statement in order to refresh her recollection. It seems to us that in fact Government counsel employed the statement not to refresh the witness' recollection but to try to control her answers by putting words in her mouth so that her testimony would agree with her statement. The effect of the tactic was to get the substance of the ex parte statement to the jury—even without offering it in evidence.[8] Zeal and perhaps righteous indignation carried the prosecution too far.

The only authority relied on by the Government to support its contention is United States v. Rappy, 2 Cir., 1946, 157 F.2d 964, 967, certiorari denied 329 U.S. 806, 67 S.Ct. 501, 91 L.Ed. 688. In the Rappy case, Judge Learned Hand wrote:

"When a party uses an earlier statement of his own witness to refresh the witness's memory, the only evidence recognized as such is the testimony so refreshed; and the party may not put the statement in evidence, although the other side may do so, and apparently the jury may call for it sua sponte * * * but when it [the statement or other memory evoking stimulus] is an account of that occasion, its falsity, if raised by the opposing party, will become a relevant issue if the witness has declared that the evoked memory accords with it * * * It was obviously proper that upon that issue the statement itself should be in evidence."

In the Rappy case the witness on the stand did not remember what he had put

---

7. The prosecution may use prior inconsistent statement to revive the recollection of adverse witnesses. See cases collected in the Annotations, 74 A.L.R. 1042. The general rule, however, requires surprise before the party may interrogate his own witness concerning previous inconsistent statement. Another limitation on this practice is that it is not permitted when the witness merely fails to testify as expected; it is necessary that the testimony given be harmful to the person calling the witness. 117 A.L.R. 1064. Here, the government did not claim surprise; and, in addition, Mrs. Eisenberg simply failed to give the evidence the government hoped she would give.

8. In Young v. United States, 5 Cir., 1938, 97 F.2d 200, 205, Judge Hutcheson wrote: "* * * [I]t is never permitted to make of the rule an artifice by which inadmissible matter may be gotten to a jury through the device of offering a witness, whose testimony is known to be adverse, in order, under the name of impeachment, to get before the jury for its weighing, favorable ex parte statements the witness has made."

in the written statement. When he was shown the written statement it refreshed his recollection and he remembered the words in the statement. In the instant case, there was no evidence as to the preparation and execution of the statement, as in Rappy, and there was no contention that the witness had forgotten anything in the statement. When it was introduced she did not declare that it refreshed her memory nor is there indication that she relied on the statement. She did not even agree with its contents. She testified that she had made matters appear worse against her husband in the statement than they were in fact.

Judge Hand's language in the Rappy case is not authority for the use of the statement as substantive proof. The section from Wigmore cited in Rappy states plainly that the party offering the statement cannot treat it as evidence.[9] In a later case Judge Hand, citing the Rappy case and this section of Wigmore, stated: "[The document used to refresh recollection] does not itself go before the jury, unless the other side puts it in." Portman v. American Home Products Corp., 2 Cir., 1953, 201 F.2d 847, 850.

In no case do we find that a statement used by a party to refresh the recollection of his witness is admissible by that party.[10] In most Mann Act cases out-of-court statements are introduced for impeachment purposes; in none of these cases has the out-of-court statement been entitled to substantive weight or entitled to go to the jury without limiting instructions.[11]

Nardi v. United States, 6 Cir., 1926, 13 F.2d 710, 711, is similar to the instant case. That was a criminal prosecution for conspiracy to obstruct justice by influencing witnesses to leave the jurisdiction. The prosecution, in examining three of its witnesses, inquired about prior statement made by the witnesses. The witnesses disclaimed any knowledge about important facts that were essential to the Government's case. The prosecution prefaced a number of inquiries by the phrase, "to refresh your recollection", just as in this case. The trial court admitted the questions for the purpose of refreshing the witness' recollection. The Government did not claim to be surprised by the testimony nor did it offer in evidence the former statements to neutralize the testimony. The Sixth Circuit, in holding this to be improper procedure, said:

"To permit a witness thus to refresh his recollection would amount to the substitution of an unreliable statement for what the witness remembers and is prepared to say. The reason forbidding the use of such former statement for the purpose logically excludes inquiries embracing its substance; otherwise the thing directly impermissible would be made acceptable by indirection. We do not hold that such inquiries are prejudicial in every case, but, where the proof of guilt is reasonably disputable, the effect of repeatedly including contents of the statement in the questions, and thus indirectly placing the statement before the jury, cannot, we think, be otherwise than prejudicial."

9. Wigmore, Evidence § 763 (3d ed. 1940).

10. McCormick points out that the adversary may inspect the document used to revive recollection and may submit it to the jury for their examination, but the party offering the witness may not do so. McCormick, Evidence 18 (1954); accord, Wigmore, Evidence § 763 (3d ed. 1940).

11. See Ditrich v. United States, 10 Cir., 1957, 243 F.2d 729; Ellis v. United States, 8 Cir., 1943, 138 F.2d 612; Pappas v. United States, 9 Cir., 1917, 241 F. 665; United States v. Biener, D.C. E.D.Pa.1943, 52 F.Supp. 54. Even Wigmore, who thinks that prior inconsistent statements should receive substantive weight, recognizes that the weight of authority is that they have no substantive or independent testimonial value. 3 Wigmore, Evidence § 1018, p. 688 3d ed. 1940).

There is no merit in the Government's contention that a juror's request to see the statement made it admissible. By then the court had already admitted the statement without limiting its effect. The district judge's comment that the statement "is in evidence" and the omission of any qualifying instruction was tantamount to directing the jury to treat it as substantive evidence.

There is something to be said for the unorthodox view that probative value should be attached to a prior out-of-court statement, consistent or inconsistent, when there is reason to think a witness' first version of material facts is more likely to reflect the truth than the witness' version at the trial; by then the witness has had time to regret an impulsive statement and also time to fabricate a smooth and different tale.[12] It is somewhat naive to assume that cross-examination under oath of a "victim" of the white slave traffic necessarily will produce evidence more trustworthy than the witness' statement given months before the trial, when the witness' memory of recent events is fresh and there is no time nor incentive, perhaps, to concoct a tale. But in the circumstances of this case even the minority who advocate acceptance of prior hearsay statements as substantive evidence would have to say that when Mrs. Eisenberg gave her statement she was in no condition to tell a trustworthy story.

The Government is in a difficult position in Mann Act cases, when it is so often necessary to rely on the victim as the principal witness for the prosecution and when so often the victim recants on the stand. But the plight of the prosecution furnishes no sound reason for lowering long-fought-over standards controlling the admission and effect of out-of-court statements. The defendant failed to receive a fair trial.

The judgment below is reversed and remanded.

12. See McCormick, The Turncoat Witness: Previous Statements as Substantive Evidence, 25 Tex.L.Rev. (1947) 573;

3 Wigmore, Evidence, § 1018, n. 2 (3d Ed. 1940).