**STATE OF MISSISSIPPI for the Use of Mrs. Robert E. DERROW and Mrs. Robert E. Derrow, Plaintiffs-Appellees,**

v.

**John S. DURHAM and United States Fidelity and Guaranty Company, Defendants-Appellants.**

**No. 30443.**

United States Court of Appeals, Fifth Circuit.

June 8, 1971.

Philip Mansour, Willard L. McIlwain, Mansour & Kilpatrick, Greenville, Miss., for defendants-appellants.

Elzy J. Smith, Charles L. Sullivan, Sullivan, Dunbar & Smith, Clarksdale, Miss., for plaintiffs-appellees.

Before RIVES, THORNBERRY and CLARK, Circuit Judges.

CLARK, Circuit Judge:

██ Based upon the Mississippi Wrongful Death Act [1], Mrs. Robert E. Derrow, a resident of Illinois, brought this diversity action on behalf of the remaining Mississippi heirs to recover for the death of her father, W. C. Wood.[2]

---

1. Miss.Code Ann. § 1453 (1942).

2. Federal jurisdiction depends upon whether complete diversity of citizenship existed between the representative plaintiff and the defendants. We conclude, based upon the apt reasoning of Allen v. Baker, 327 F.Supp. 706 (N.D.Miss.1968) that even though other persons who had an interest in the suit under the Mississippi Wrongful Death Statute, but who were not parties to the suit, share a common residence with one or more of the defendants, diversity jurisdiction is present. See also C. Wright, Federal Courts § 29 (2d ed. 1970).

Named as defendants were John S. Durham, former sheriff of Washington County, Mississippi, and the United States Fidelity and Guaranty Company, the surety on his official indemnity bond. The complaint alleged that while Wood was under arrest by Durham and his deputies, their wrongful acts or omissions caused Wood's death. A jury verdict in favor of Mrs. Derrow resulted and Durham and the United States Fidelity and Guaranty Company now appeal. Since the trial court permitted Mrs. Derrow to introduce a hearsay tape recorded statement which not only was used to impeach her own witness, who she knew when offered would testify to the contrary, but was also used to build a hypothetical question which formed a substantial basis for establishing proximate cause, we reverse.

From the veritable avalanche of evidence adduced at trial, the following distillate forms a sufficient factual matrix. In the early morning hours of New Year's Eve of 1966, Sheriff Durham and two deputies were routinely patrolling the highways in the vicinity of Greenville, Mississippi. When a car driven by the undisputedly well-intoxicated Wood crossed the centerline and forced the patrol vehicle onto the shoulder of the road, the law officers pursued and stopped it. Wood was arrested and placed in Sheriff Durham's automobile for transportation to the Washington County jail for booking.

Unlike the facts surrounding Wood's arrest, the clarity of the events occurring at the jail is obscured by the heat of forcefully presented conflicting evidence. Attorneys for Durham introduced testimony which showed the following. Wood, because of his hesitancy, had to be picked up, carried into the jail, and placed in his cell where he was left standing. Shortly after being incarcerated, the Sheriff examined Wood, because he had allegedly swallowed his false teeth. At this time, the Sheriff declined to send Wood to the hospital, a course of action which he felt Wood's physical condition justified. Later, when Wood complained of a headache, he was given aspirin by the jailer and the trusty.

Mrs. Derrow's attorneys introduced evidence to expose an entirely different set of happenings. According to this evidence, based partially on the tape recorded statement of a prisoner-trusty, Eddie Brooks, Wood was beaten by Sheriff Durham and his deputies prior to being carried into the jail. At the time he was carried into the jail, he entreated the law officers not to beat him anymore. Once in the jail, Wood was pushed by the Sheriff or his deputies with such force that the deceased fell and struck his head on the marble floor with an auditorily perceptible impact—like a watermelon dropped on concrete. Other inmates called the deputies to Wood's aid twice, but no aid was ever rendered.

There is very little controversy as to subsequent events. The following morning, Mrs. Wood, widow of the deceased, and her son-in-law, Mr. Pittman, went to the jail to inquire as to Wood. Initially, Pittman found Wood conscious and able to converse, although he had visible lacerations and contusions. Pittman left to seek Wood's release, and when he returned to Wood's cell, the deceased was unconscious. In this unconscious state, Wood was placed in Pittman's car and taken to the Greenville General Hospital. There his physician, Dr. Leon Lenoir, a specialist in internal medicine, diagnosed a cerebral hemorrhage and transferred Wood to a hospital in Jackson, Mississippi where death soon followed.

Also worthy of consideration is undisputed evidence that Wood had previously been treated for coronary thrombosis, for which Dr. Lenoir had prescribed the anti-coagulant, coumadin. Dr. Lenoir had instructed Wood not to indulge in intoxicants while taking this drug. Evidence showed that Wood had taken coumadin, which remains in a patient's system for 48 to 72 hours following its administration, on the morning preceding the night of his arrest by Sheriff Durham.

Following a lengthy trial, the jury returned a verdict for 20,000 dollars, actual damages, and 80,000 dollars, punitive damages. The brief of Durham and his surety, the United States Fidelity and Guaranty Company, is prolific with points of error. For the purpose of this opinion, they may be grouped as follows: (i) the point which requires reversal; (ii) those points which may be unique to the first trial or are likely to arise on remand in such a different context as to make comment inappropriate, and (iii) those points on which sound judicial husbandry indicates a present comment in view of their likely reoccurrence on remand.

## 1. THE REVERSIBLE ERROR—ADMISSION OF THE "IMPEACHMENT" TAPE RECORDING

█ Durham designates as the most prejudicial ruling of the trial court that which admitted the tape-recorded statement of Eddie Brooks, a trusty in Washington County Jail at the time of Wood's incarceration. The matter arose against this background. Earl Fisher, Sheriff Durham's Chief Criminal Deputy, had secretly recorded a conversation he had with Brooks in an automobile in front of Brooks' home at a time when Brooks was not in custody. In this conversation, Brooks stated that contrary to his earlier statement—taken while still in jail—he had seen Wood physically abused while in the Sheriff's custody. Mrs. Derrow informed the court she intended to introduce Fisher and through him, because of his agency relationship with the Sheriff, introduce Brooks' taped statement. The trial judge refused to permit this course of action on the basis that when Fisher had obtained the taped evidence, he was acting without the authority of the Sheriff, and, it would be unnecessary to rely upon the tape recorded statement since Eddie Brooks was available to testify in person.

The problem for Mrs. Derrow was not nearly so simple. She knew from prior conversations Brooks would adhere to his jailhouse version of events which exculpated the Sheriff of wrongdoing, if they called him as their witness; but in view of the lack of any viable alternative to make use of the tape, she decided to call Brooks solely for the purpose of impeaching his testimony by means of the prior inconsistent statement contained in the hearsay tape recording. Durham objected to the introduction of the tape, relying upon the common law prohibitory rule which forbids a party from impeaching his own witness. The trial judge overruled Durham's objection.

Mrs. Derrow attempts to justify the trial court's admission of the tape under the exception to the common law prohibitory rule against impeaching one's own witness embodied in the provisions of Fed.R.Civ.P. 43(b), permitting impeachment when an adverse party is called as a witness. However, Brooks was shown only to have been a special status prisoner of the Sheriff and he did not occupy even that position when the tape was made. He, therefore, cannot be classified as an adverse party under the rule. Nor do we find that Brooks fell into that category of indispensable and therefore impeachable witnesses, whom the attorney is compelled to call or whom by legal intendment he cannot avoid calling, as in the case of an attesting or subscribing witness to a deed or a will. See for example, Clark v. Lansford, 191 So.2d 123 (Miss.1966). The calling of the witness Brooks was both knowing and voluntary. Likewise, it cannot be said that the tape could be admitted since it was being used only to contradict the witness and not to impeach him. It is true that in United States v. Williamson, 424 F.2d 353 (5th Cir. 1970), we held that a party is free to offer other witnesses to prove facts are otherwise than one of his own witnesses has stated, for this amounts to contradictory evidence. This was not such a case. Mrs. Derrow's attorneys were not calling different witnesses; rather, they were at most seeking to impeach Brooks with his own prior inconsistent statement.

This Circuit has recently taken an unequivocal position which substantially embodies the common law prohibition against offering a witness whose testimony is known to be adverse, in order, under the name of impeachment, to get before the jury for its weighing ex parte statements made by the witness. In United States v. Johnson, 427 F.2d 957 (5th Cir. 1970), a panel of this Circuit cited with approval the language of United States v. Hicks, 420 F.2d 814 (5th Cir. 1970), wherein the controlling law was enunciated as follows:

"The rule in its original and strict form against impeaching one's own witness is discredited everywhere, and it is generally recognized that impeachment may be resorted to where a witness has surprised the party offering him, by his testimony. * * * It is fundamental, we think, that the party offering the witness be really surprised by his testimony. Further, it is equally fundamental that the impeaching testimony be admitted not for the purpose of supplying what the witness was expected to, but did not, say, as the basis for a verdict, but only to eliminate from the jury's minds any positive adverse effect which might have been created by the testimony which has surprised the offerer. [W]itnesses sometimes fail to come up to expectations when they actually take the witness stand. The temptation is then, of course, very great * * * to get before the jury any written statement previously made by the witness, so that the jury can then really use the inculpatory statement made by him as substantive evidence to prove the guilt of the accused.

Of course, such an extra judicial statement is not admissible as substantive evidence, because it clearly falls afoul the hearsay rule. This court has repeatedly held so. In Young v. United States, 5 Cir. 1938, 97 F.2d 200, 117 A.L.R. 316, this court said:

The Mississippi rule relative to impeaching one's own witnesses is in harmony with the above. Manning v. State, 188 Miss. 393, 195 So. 319 (1940). Of course the more relaxed of the rules would apply if there was a difference. Fed.R.Civ.P. 43(a).

Before impeachment is possible, a party must show that the initial testimony of the witness was truly surprising to him. After this is done, the hearsay statement may be admitted but then only to impeach and not to supply some element of substantive proof. The instant case fails to satisfy the first of these criteria—that no surprise was produced by Brooks' initial testimony as Mrs. Derrow's witness. Her attorneys readily admitted to the trial judge before the event that they planned to call Brooks and then use the tape to impeach him. The extra-impeachment functions of the admitted tape are equally clear. The contents of the recorded statement were used to supply key factual elements in order to build a hypothetical question which was presented to Mrs. Derrow's doctor, and it was only by means of this medical hypothetical that probable cause was established.[3] These things being so, we must reverse and remand for a new trial.

## 2. ERRORS NOTED BUT NOT APPROPRIATELY RULED ON NOW

The Sheriff and his bondsman complain of the form of the hypothetical question posed to Dr. Lenoir; the failure of Mrs. Derrow's proof to show proximate causation; the propriety of compensatory damage proof; the correctness of allowing the jury to pass on punitive damages; the claimed prejudice

---

3. The trial judge himself recognized this state of affairs in a reply to Mrs. Derrow's attorney, by stating that he was of the opinion that if the tape recording should not have been admitted then the error was so prejudicial that the defendants would be entitled to a new trial.

of newspaper reporting on the unsequestered jury; the form of closing argument; and numerous other evidentiary and procedural rulings which, overall, created an impression in the jury's minds that the Derrow claim was well founded and that the Sheriff's defense was without merit—ranging from the refusal to admit a partially consumed bottle of liquor in evidence to the opportunity to continue to question certain witnesses. Each of these matters is more likely than not to recur in any subsequent trial in such varied form that it would be idle to attempt to anticipate or rule on the same now. We deem it sufficient to say that all these matters are generally committed to the sound discretion of the trial court in its duty to conduct a fair trial.

### 3. CLAIMED ERRORS LIKELY TO RECUR

Sound judicial husbandry requires that we deal with those matters which will, without question, recur at any retrial. Significant among these is the ascertainment of what duty or degree of care should have been exercised by the Sheriff in his dealings with Wood.

The trial court instructed the jury that the Sheriff was under a duty to use reasonable care in examining the deceased and that if Wood's condition was such that a reasonable man would have ordered medical attention then, in that event, Durham was negligent. It is contended that this is reversible error since any common law rule which may have imposed the duty of reasonable care on one charged with the custody of prisoners, has been abrogated by § 4262 of the Mississippi Code of 1942, which provides in pertinent part:

> When any person confined in jail shall be in need of medical or surgical aid, the sheriff shall immediately examine the condition of such prisoner and, if he is of the opinion that the prisoner needs such aid, he shall call in a physician or surgeon to attend him * * *.

It is Sheriff Durham's contention that this statutory language makes such a determination on his part a judicial function and, because of the doctrine of judicial immunity, there is no remedy for an erroneous conclusion by a sheriff, notwithstanding that a reasonable man might have determined otherwise.

Section 4262 of the Mississippi Code has received scant decisional interpretation. The most recent case dealing specifically with this Code section is Farmer v. State, for Use of Russell, 224 Miss. 96, 79 So.2d 528 (1955). In *Farmer*, it was argued that § 4262 made it optional as to whether the sheriff would call a doctor for a prisoner, who was denied medical attention for ulcers, a condition which caused his ultimate death. Although the sheriff in *Farmer* was repeatedly advised of the prisoner's condition, he did not even examine him. The Mississippi Supreme Court concluded that there was "no showing in the record that the failure to call a doctor was because of any opinion, judicial or otherwise, formed by the sheriff or jailer that the prisoner did not need medical care."

█ We feel that the Mississippi Supreme Court would arrive at the same conclusion under the facts in the instant case. A sheriff cannot escape his responsibility to take reasonable care of prisoners in his custody by simply making a casual examination of one who obviously needs medical attention, then declaring that he judicially determined that he did not need such aid. We are reenforced in this view by the language of *Farmer* which cites Tyler v. Gobin, 94 F. 48 (C.C.Ind.1899) as "one of the best reasoned cases we have found on the law." *Tyler*, after reviewing the duty imposed on a sheriff to exercise due care and diligence in keeping possession of property levied on by virtue of his office, concludes with this language:

> If the law imposes a duty of care in respect of animals and goods which he [the sheriff] has taken into his possession by virtue of his office, why

should not the law impose the duty of care upon him in respect of human beings who are in his custody by virtue of his office? Is a helpless prisoner in the custody of a sheriff less entitled to his care than a bale of goods or a dumb beast? The law is not subject to any such reproach. When a sheriff, by virtue of his office, has arrested and imprisoned a human being, he is bound to exercise ordinary and reasonable care, under the circumstances of each particular case, for the preservation of his life and health. This duty of care is one owing by him to the person in his custody by virtue of his office, and for a breach of such duty he and his sureties are responsible in damages on his official bond.

The trial judge in the case at bar was correct in instructing the jury on the question of the duty owed by Sheriff Durham to the decedent Wood.

██ A point has also been raised as to whether the court erred in failing to instruct the jury concerning the contributory negligence of Wood. While this is another area which we feel should be left to the discretion of the trial judge because of the unforeseeability of how it will be developed at retrial, it does seem apropos to add the following comments. A contributory negligence instruction would be improper, if the proof shows that Wood's death was the result of the wilful, wanton or reckless actions of Sheriff Durham toward an intoxicated man, even though such intoxication amounted to negligence on the part of Wood. St. Louis & S. F. R. Co. v. Ault, 101 Miss. 341, 58 So. 102 (1912). On the other hand, the proof could develop in such a way that the court may choose to submit both issues to the jury in the alternative. It would not necessarily be inconsistent for the court to instruct the jury to determine whether any negligence on the part of the sheriff amounted to such gross or wilful misconduct or would justify the imposition of punitive or exemplary damages and, if no such gross negligence be found, whether the negligence of the deceased proximately caused or contributed to his demise and therefore whether any recovery should be reduced under Mississippi's comparative negligence statute.[4] Conceivably, if the district court thought the proof so required, both fact issues could be presented in this manner. The final judgment appealed from is reversed and the cause is remanded for further proceedings not inconsistent herewith.

Reversed and remanded.

4. Miss.Code Ann. § 1454 (1942).