**Ed F. VANSTON, Plaintiff-Appellee,**

v.

**CONNECTICUT GENERAL LIFE INSURANCE COMPANY, Defendant-Appellant.**

No. 72–2670.

United States Court of Appeals, Fifth Circuit.

May 17, 1973.

Rehearing Denied July 3, 1973.

Larry M. Lesh, Dallas, Tex., for defendant-appellant.

Ivan Irwin, Jr., Dallas, Tex., for plaintiff-appellee.

Before AINSWORTH, GODBOLD and CLARK, Circuit Judges.

CLARK, Circuit Judge:

■ Ed F. Vanston brought this action for damages against Connecticut General Life Insurance Company (Connecticut General), alleging breach of contract as well as wrongful interference with and improper competition against Vanston's efforts to promote and sell insurance-related retirement programs to various companies and associations in the moving industry. In response to special issues submitted, the jury found that Connecticut General and Puritan Life Insurance Company, an almost wholly-owned subsidiary of Connecticut General, agreed with Vanston that neither would compete for group insurance business in the mass markets

developed by Vanston. The jury further found Connecticut General did interfere and compete in such a market and that but for this interference Vanston would have in reasonable probability secured a sponsorship of his retirement program from Allied Van Lines, Inc. In addition, the jury concluded Connecticut General, which did underwrite this account, would not have obtained Allied Van Lines' group pension business independently of the efforts made by Vanston. The jury found four separate money verdicts for Vanston in the total sum of 915,000 dollars. The judge rendered judgment notwithstanding the verdict in favor of Connecticut General on one of these damage issues, and awarded Vanston a total of 315,000 dollars in actual damages plus 500,000 dollars as exemplary damages. This appeal ensued. We find that the trial court erred in admitting into evidence crucial out-of-court statements of a deposed witness and vacate and remand for further proceedings. In addition, it is appropriate to dispose of other issues presented on the instant appeal which are likely to recur on remand.

### The Parol Evidence Rule

The first defense asserted by Connecticut General was that the Texas parol evidence rule [1] precluded a finding that any oral agreement between Connecticut General, Puritan, and Vanston provided that the insurance companies would not compete in the markets developed by Vanston. The company points to a written agreement between the parties which provides in part:

AGENCY FORCE. The General Agent may organize, train, and maintain an agency force in the territory in which he is authorized from time to time to represent the Puritan Life, *which territory shall not be assigned exclusively to the General Agent* . . . . [Emphasis added by Connecticut General.]

In addition, the agreement contains the following integration clause:

PRIOR AGREEMENTS. This Agreement shall supersede any prior Agreement between the Puritan Life and the General Agent in relation to policies issued through the General Agent after this Agreement becomes effective. . . .

This argument, however, falls under the weight of testimony by Connecticut General's own employees that the Puritan general agency contract was not intended to integrate the tripartite agreement relative to market development. According to the testimony, Vanston, in the terminology customarily used by Connecticut General, was a "business partner" who did considerably more than a normal general agent. Connecticut General's agreements with such business partners ordinarily were not in written form, and the written contract with Puritan "cover[ed] only that portion of the relationship which could be called the general agency relationship." The agreement not to enter into competition with Vanston in the mass markets which he undertook to develop, and more specifically as to the accounts or sponsorships which he sought to secure, is not inconsistent with the provisions of the written agency contract providing that no exclusive territory, i.e., geographical region, would be assigned to him.

The result we reach is not precluded by the "prior agreements" language of the contract, set out *supra*. The principle was stated in Ragland v. Curtis Mathes Sales Co., 446 S.W.2d 577 (Tex.Civ.App.1969):

The parol or extrinsic evidence rule "is particularly applicable where the writing contains a recital that it contains the entire agreement between the parties" . . . . 30 Am.Jur. 2d, Evidence, Sec. 1019, p. 155.

This sound principle, however, does not reach beyond the scope of the integra-

---

1. The parol evidence rule is a substantive matter as to which state law controls in this diversity case. Harville Rose Service

v. Kellogg Co., 448 F.2d 1346 (5th Cir. 1971), cert. denied, 405 U.S. 987, 92 S.Ct. 1248, 31 L.Ed.2d 453 (1972).

tion clause contained in the contract. For example, an integration clause providing that "this writing contains the full agreement of the parties as to A" does not preclude the proof of additional consistent terms relating to B. The language in this contract does not purport to integrate into the written contract all agreements between the parties, but only those agreements concerning the issuance of policies by Vanston as a general agent. As Connecticut General's own witnesses testified, the duties of a general agent were not the same as those which Vanston undertook in developing the moving industry market. Moreover, if the question be deemed a close one, we think it significant to note that the form agreement signed by Vanston was prepared by Connecticut General and thus any ambiguities should be resolved against it. In these circumstances the parol evidence rule does not prevent Vanston from proving additional contract terms which were not inconsistent with those embodied in the written agreement. *See, e.g.,* Aboussie v. Aboussie, 441 F.2d 150 (5th Cir. 1971); Hubacek v. Ennis State Bank, 159 Tex. 166, 317 S.W.2d 30 (1958); Don Drum Real Estate Co. v. Hudson, 465 S.W.2d 409 (Tex.Civ.App.1971); Conner v. May, 444 S.W.2d 948 (Tex.Civ.App. 1969), error ref. n.r.e.

### The Statute of Frauds

Connecticut General next raised the argument that the contract found by the jury was unenforceable because it was not to be performed within one year, and thus was within the Texas Statute of Frauds.[2] Vanston argued in reply that, since the contracts specified no definite period of duration, under Texas law it was outside the ambit of the Statute. This point is well taken with respect to Vanston's obligations under the contract, since there was no proof that he could not have performed within

one year even though the parties may have anticipated a more substantial period of business accord. *See* Bratcher v. Dozier, 162 Tex. 319, 346 S.W.2d 795 (1961); Eisenbeck v. Buttgen, 450 S. W.2d 696 (Tex.Civ.App.1970); Irwin v. Prestressed Structures, Inc., 442 S.W.2d 406 (Tex.Civ.App.1969), error ref. n.r.e.; Sapphire Royalty Co. v. Davenport, 306 S.W.2d 202 (Tex.Civ.App.1957) error ref. n.r.e. This explanation, however, looks only to one-half of the contractual equation.[3] Connecticut General contends that under Vanston's interpretation of its agreement it was obligated to refrain from competition in the protected markets even after the termination of its business relationship with Vanston and certainly for a period of more than one year. Vanston testified, however, that the non-competition agreement would survive only so long as the business relationship continued. Connecticut General points to no persuasive evidence that the term of the non-competition agreement was to be any more extended or any less indeterminate than the underlying business relationship between the parties. Thus, at least this portion of Connecticut General's contractual obligation falls within the general rule of Texas law that where no period of performance is stated the statute is inapplicable.

Connecticut General relies upon Hall v. Hall, 158 Tex. 95, 308 S.W.2d 12 (1957), but that case is inapposite here because it stands for the rule that a contract which could not possibly be fully performed within the period of one year is within the Statute even though no period of time is specified by the contract. *See* Bratcher v. Dozier, *supra.* Moreover, in *Hall* the plaintiff attempted to adopt the inconsistent positions (1) that the absence of any stated time for performance placed the contract without the Statute, and (2) that his damages

2. Tex.Bus. & Com.Code § 26.01 (1958), V.T.C.A.

3. Under Texas law even full performance by one party will not necessarily allow

the performing party to sue for breach of a promise which is within the Statute, Chevalier v. Lane's, Inc., 147 Tex. 106, 213 S.W.2d 530, 6 A.L.R.2d 1045 (1948).

should be computed on the basis that the contemplated complete performance would necessarily require several years.

■■ It appears that at least one of the obligations of Connecticut General as found by the jury (*i.e.*, the agreement not to use the information obtained from Vanston to compete with him) would extend beyond the life of the joint venture and thus could not have been performed within one year. That fact is immaterial in this action predicated solely upon breach of obligations which could have been performed within one year. If the contract is severable—that is, susceptible of division and apportionment, having two or more parts not necessarily dependent on each other—the fact that one obligation is unenforceable does not prevent a recovery as to the other. Upson v. Fitzgerald, 129 Tex. 211, 103 S.W.2d 147 (1937). Here the obligation sued upon, the agreement not to compete so long as the business venture continued, is clearly severable from Connecticut General's promise not to use Vanston's trade secrets. Since Vanston fully performed his obligation, he is entitled to recover for breach of this divisible and enforceable contractual obligation. *See* 3 S. Williston, Law of Contracts § 532, at 766 (3d ed. Jaeger 1960). Thus, the Statute of Frauds is no bar to Vanston's recovery.

### Actual Damages

■ In response to the special issues submitted, the jury made three separate findings as to Vanston's actual damages, totalling 415,000 dollars.[4] The court granted Connecticut General a judgment notwithstanding the verdict of the jury on Special Issue No. 11, and rendered judgment for Vanston on Special Issues Nos. 12 and 16. Special Issue No. 12 required the jury to determine the amount of money which would compensate Vanston for the commissions he would have earned from the Allied Van Lines account. In answer to Special Issue No.

4. Special Issue No. 11:
 What sum of money, if any, if paid now in cash, do you find from a preponderance of the evidence would reasonably compensate Ed F. Vanston for being the efficient and producing cause of such decision?
 Answer in "DOLLARS", if any, and "CENTS," if any.
 Answer: $100,000.00
 Special Issue No. 12:
 What amount of money, if any, if paid now in cash, do you find from a preponderance of the evidence would compensate Ed F. Vanston for the commissions, if any you find, he would have earned from the Allied Van Lines, Inc., account?
 You are hereby instructed that you may take into consideration the length of time that you reasonably believe, from a preponderance of the evidence, that Ed F. Vanston would, in all reasonable probability, have continued to write the retirement coverage of Allied Van Lines, Inc.
 You are further instructed that you may take into consideration expenses incurred by Ed F. Vanston, if any, in the development of his mass marketing operation.

You are further instructed that damages are not rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient if a reasonable basis of computation is afforded, although the result be only approximate.
 You are further instructed that in determining damages, if any, you shall take into consideration the cost to Ed F. Vanston of expenditures that would necessarily be made in servicing the Allied Van Lines, Inc., account, but you shall not take into consideration remote costs, overhead expenses or fixed expenses which would neither increase nor decrease in servicing the Allied Van Lines, Inc., account.
 Answer in "DOLLARS," if any, and "CENTS," if any.
 Answer: $165,000.00
 Special Issue No. 16:
 What amount of money, if any, if paid now in cash, do you find from a preponderance of the evidence would compensate Ed F. Vanston for the reasonable value of his services in connection with his development of the American Movers Conference account and solicitation of the Allied Van Lines, Inc., account?
 Answer in "DOLLARS," if any, and "CENTS," if any.
 Answer: $150,000.00

16, the jury fixed the reasonable value of the services rendered by Vanston in connection with his development of the American Movers Conference account *and* the solicitation of the Allied Van Lines account. A side-by-side comparison makes it apparent that the damages awarded under Special Issue No. 16 for the value of Vanston's services in developing the Allied Van Lines account were to that extent duplicitous of the damages awarded under Special Issue No. 12.[5] Vanston is not entitled to recover the reasonable value of his business development services in addition to the commissions he contracted to receive from that account. Since under the agency agreement Vanston was to bear his expenses without reimbursement from the company, Vanston would be made whole by recovery of the jury-determined value of the commissions he would have received. It may be that some of the damages awarded under Special Issue No. 16 were intended to compensate Vanston for the reasonable value of his services in connection with the development of the American Movers Conference account. If this theory of recovery of damages is to be submitted to the jury on retrial, its presentation should be clearly segregated from any recovery for lost commissions on the Allied account.[6]

### Exemplary Damages

■■ Connecticut General next contends that the award of 500,000 dollars in exemplary damages was improper. We agree. Though Vanston would characterize his action as one based at least partially on Connecticut General's malicious and wrongful interference with his business relationship with Allied, his claim is necessarily founded upon Con-

necticut General's contractual agreement not to compete in the markets developed by Vanston. But for this non-competition agreement Connecticut General's interference would be no more than permissible competition. The law of Texas is well-settled that exemplary damages may not be awarded for a mere breach of a contract. In Barrett v. Curtis, 407 S.W.2d 359 (Tex.Civ.App.1966), the court found it unnecessary to reach the contention that there was an exception to the general rule for cases involving breach of non-competition agreements, but stated that it had found no Texas authority to support the proposition. *See also* Price v. Miller, 112 S.W.2d 761 (Tex.Civ.App.1937). We conclude that under the law of Texas exemplary damages cannot be awarded in this case.

### Hearsay—Impeachment

In its attack on trial procedures below, Connecticut General argues that the district court erred in admitting a transcript of a telephone conversation between Vanston and one Frank, an employee of Allied Van Lines, into evidence for all purposes and not just for the limited purpose of impeachment. Vanston counters that the transcript of the tape was adopted by Frank during the taking of his deposition and as a result of that adoption is not to be considered hearsay. During the deposition, Frank at first denied making any statement that Vanston had almost received the contract with Allied Van Lines and that he had run a close second to Connecticut General. When his recollection was refreshed by examination of the written transcript of the taped conversation, he modified his testimony to state that he could not deny having had such a conversation. The critical factor, however, insofar as whether this taped conversation is to be

---

5. This is true regardless of how the ambiguous third paragraph of Special Issue No. 12 is interpreted.

6. This issue was isolated for discussion on appeal for the first time in Connecticut General's reply brief, where it is asserted that any such theory of recovery is out-

side the pleadings and unsupported by the proof. In light of the remand we require, it is appropriate that the parties submit this issue to the trial court for its initial determination. We intimate no opinion here as to whether Vanston is entitled to have this theory of recovery submitted to the jury on retrial.

344

deemed hearsay is that at no time did Frank affirm that his prior statements were true. Instead, he contended that the statements were made to Vanston merely "to get rid of the guy."

█ The Advisory Committee's Note to Rule 801 of the proposed Federal Rules of Evidence epitomizes the legal issue thus:

> *Prior statement by witness.* Considerable controversy has attended the question whether a prior out-of-court statement by a person now available for cross-examination concerning it, under oath and in the presence of the trier of fact, should be classed as hearsay. If the witness admits on the stand that he made the statement *and that it was true,* he adopts the statement and there is no hearsay problem. The hearsay problem arises when the witness on the stand denies having made the statement or *admits having made it but denies its truth.* The argument in favor of treating these latter statements as hearsay is based upon the ground that the conditions of oath, cross-examination, and demeanor observation did not prevail at the time the statement was made and cannot adequately be supplied by the later examination. The logic of the situation is troublesome. So far as concerns the oath, its mere presence has never been regarded as sufficient to remove a statement from the hearsay category, and it receives must less emphasis than cross-examination as a truth-compelling device. . . . Nor is it satisfactorily explained why cross-examination cannot be conducted subsequently with success. The decisions contending most vigorously for its inadequacy in fact demonstrate quite thorough exploration of the weaknesses and doubts attending the earlier statement. . . . The bulk of the case law nevertheless has been against allowing prior statements of witnesses to be used generally as substantive evidence. Most of the writers and Uniform Rule 63(1) have taken the opposite position. [Emphasis added.]

In spite of the wide-spread criticism of the rule noted by the Advisory Committee, *see also* C. McCormick, Evidence § 39 (1954), it is well established as the law of this circuit. *See* United States v. Gregory, 472 F.2d 484 (5th Cir. 1973); McIntyre v. Reynolds Metals Company, 468 F.2d 1092 (5th Cir. 1972); Eisenberg v. United States, 273 F.2d 127 (5th Cir. 1959); Slade v. United States, 267 F.2d 834 (5th Cir. 1959); Feutralle v. United States, 209 F.2d 159 (5th Cir. 1954). *See also* Harman v. United States, 199 F.2d 34 (4th Cir. 1952); Ellis v. United States, 138 F.2d 612 (8th Cir. 1943). Thus, though the acknowledged but unaffirmed prior statement could have been introduced for impeachment purposes (subject to the rule discussed in the next paragraph *infra*), the court erred in admitting it for all purposes.

█ Moreover, because the recording was available for impeachment only, Vanston ran afoul of the well-settled rule that a litigant may not offer a witness whose testimony he knows in advance will be adverse in order to get before the jury evidence admissible only for impeachment and which would otherwise be inadmissible hearsay. Mississippi for Use of Derrow v. Durham, 444 F.2d 152 (5th Cir. 1971). *See also* United States v. Johnson, 427 F.2d 957 (5th Cir. 1970); Young v. United States, 97 F.2d 200 (5th Cir. 1938). The Texas courts have uniformly adhered to the same rule. *See* Zanders v. State, 480 S.W.2d 708 (Tex.Cr.App. 1972); City of San Antonio v. Poulos, 403 S.W.2d 168 (Tex.Civ.App.), *aff'd on other issues,* 422 S.W.2d 140 (Tex.1966). It could hardly be contended that the introduction of Frank's deposition and the telephone transcript satisfied the requirements of this rule.

█ Finally, the extrajudicial statements involved in this case cannot be brought within the scope of *res gestae* exception to the hearsay rule. The telephone conversation took place some five months after Allied had made its

decision to sponsor Connecticut General's proposal rather than Vanston's. Nor is there any merit in the contention that these statements can be proved as operative facts and hence are without the hearsay rule. These out-of-court statements were introduced for the sole purpose of proving the truth of the facts asserted in them.

### Materiality of the Evidentiary Error

 These improperly admitted statements were by no means cumulative but were for all practical purposes the only evidence adduced to satisfy Vanston's burden of demonstrating, under his tortious interference claim, that in reasonable probability he would have been awarded the Allied account but for Connecticut General's interference.[7] The transcription of the telephone conversation contained the following colloquy:

ED [Vanston]: Tom, let me ask you this. Was I the No. 2 choice?

TOM [Frank]: Yes.

ED: Well, that's what I thought. I had always thought that I was your No. 1 choice—

TOM: Ed, it was very close as to 1 and 2. I will say that. I ruled out, now, I'd be talking out of turn if I go any further, but Southland was ruled out on a couple of bases, not of which should be discussed—

ED: Oh, yeah, that's right, sure. Well, you know, when you lose something you've fought as hard for as I fought for this one, you want to know just where you stood because that's the only way you learn.

TOM: You stood second and believe me it was a close race between 1 and 2.

If the jury gave any credence to these erroneously-admitted statements of Allied's Insurance Manager it was bound to have affected its determination of the "but for" question. It is clear that this cannot be classified as harmless error.

### Failure to Prove Contractual Damages

Vanston asserts an alternative contention. While he may have been required to carry the "but for" proof burden to recover on the basis of tort, no such element of proof was requisite to recovery on his claim predicated on Connecticut General's breach of its contractual obligation not to compete. He argues that as a result of his exclusive right to sell in the moving industry market he is entitled to a commission whether or not he was the procuring cause of the sale. While the general rule upon which this argument is grounded is irrefutable,[8] it cannot be applied here to uphold that portion of the judgment rendered by the court below on the special verdict which awarded him the commissions he would have earned. The special verdict on which the damage award was predicated inquired only as to the value of the commissions *Vanston* would have earned on the sale of *his* proposal. For whatever reason, no sale of Vanston's product was ever made.

 Nowhere does the evidence purport to show that the amount of commissions which would have been contractually due to Vanston was equivalent to the commissions due to one who sold Connecticut General's program to Allied, nor was there any jury finding to that effect. Rather, the record is replete with evidence that the two products were substantially dissimilar. According to the testimony, the Connecticut General's plan accepted by Allied differed from Vanston's product in that it was not life insurance oriented, empha-

---

7. This was the theory on which this phase of the case was submitted to the jury. Vanston took no exception below and does not contest the correctness of this legal theory here.

8. *See, e.g.,* Metal Structures Corp. v. Bigham, 347 S.W.2d 270 (Tex.Civ.App. 1961), *error ref. n.r.e.;* Holmes v. Holik, 238 S.W.2d 260 (Tex.Civ.App. 1951); *see generally* Annot., 12 A.L.R. 2d 1360 (1950).

sized group rather than individual benefits, stressed investment return rather than death benefits, and could produce a cash value at retirement age of more than twice that promised under Vanston's proposal. Thus, from all that is apparent from the record, the commissions under the two plans were based on entirely different measures and standards. This record will not permit us to conclude that the jury's estimate of the value of the commissions which might have been earned on the sale of Vanston's product would be indicative of the commissions he would have received on the sale of Connecticut General's markedly different product. Of course, our decision does not preclude a submission of this issue to the jury on remand assuming competent evidence is adduced as to the value of the commissions which would have been earned on the sale of the Connecticut General proposal.

This evidentiary error requires that we vacate the judgment entered and remand this case for further proceedings not inconsistent herewith.

Vacated and remanded.

### ON PETITION FOR REHEARING

Before AINSWORTH, GODBOLD and CLARK, Circuit Judges.

PER CURIAM:

On rehearing Vanston challenges the correctness of that portion of our original opinion which held that he had failed to establish damages under his contractual theory of recovery. He contends that Connecticut General's breach of the exclusive agency contract prevented his performance and that Texas law entitles him to recover the reasonable profit he would have made on the sale of his product. He now points out that Texas would allow as a prima facie measure of that reasonable profit the amount represented by the stipulated commission, citing Park v. Swartz, 110 Tex. 564, 222 S.W. 156 (1920); McDonald v. Davis, 389 S.W.2d 494 (Tex.Civ. App.1965). *See also* Pickett v. Bishop, 148 Tex. 207, 223 S.W.2d 222 (1949). Thus, he asserts, he may still recover in contract without further proof of damages.

The rule enunciated in these cases is of no aid to Vanston on this appeal. Such a measure of damages for breach of contract is based on a presumption that the agent would have made the sale but for the interference of the principal and places the burden on the principal to prove that the agent could not or would not have made the sale. In the case at bar, substantial evidence was introduced to show that Vanston would not have earned the commissions even if Connecticut General had not competed for the Allied account. The jury resolution of this Factual dispute—whether Vanston would have sold his product to Allied—was marred by the erroneous introduction into evidence of the transcript of the taped conversation, as discussed in the original opinion. Just as this renders the jury's determination improper as a basis for tort recovery, it also forecloses any award of contractual damages premised on the jury finding.

In addition, Vanston contends that the original opinion misapprehended the effect of a trial stipulation that Frank was called as "a neutral witness." Vanston argues that this agreement of counsel removes this case from the realm of the rule that a party may not prostitute the exception to the hearsay rule permitting the use of prior inconsistent statements for the purpose of impeachment by intentionally offering a witness whose testimony he knows in advance will be adverse. We reject this contention.

Though the rule enunciated by Mississippi Derrow v. Durham, 444 F.2d 152 (5th Cir. 1971), had its origin in the common law notion that a party vouched for the credibility of the witnesses he called and was morally bound by their testimony, *see* 3A Wigmore on Evidence § 897–98 (Chadbourn Rev. 1970), it also serves to prevent the introduction of hearsay evidence with

no more valid purpose than the hope that the jury may consider it as substantive evidence despite the judge's contrary instructions. It remains transparent in this case that the exposure (of Frank's hearsay statements) to the jury was Vanston's only purpose in offering the deposition and transcript of the telephone conversation.

Even assuming that a witness stipulated to be neutral is to be treated as a hostile witness for the purpose of allowing impeachment through hearsay, here there can be no contention that the transcript was introduced to repair the damage caused by surprise testimony. *See, e.g.*, United States v. Gregory, 472 F.2d 484 (5th Cir. 1973); United States v. Dobbs, 448 F.2d 1262 (5th Cir. 1971); Mississippi for Use of Derrow v. Durham, *supra*. Any harm to Vanston's cause which resulted from the reading of Frank's deposition was intentionally self-inflicted. *See* Culwell v. United States, 194 F.2d 808 (5th Cir. 1952). On these facts the transcript of Frank's telephone conversation was not properly admissible for any purpose.

The petition for rehearing is denied.